In the Matter of the Estate of ANGELA DI BELLA, Deceased.

Surrogate's Court, Broome County, November 16, 1950.

*Peter N. Buono, A. E. Gold* and *James B. Gitlitz* for Florence Tanzini, as administratrix of the estate of Angelo Di Bella, deceased, petitioner.

*Roy C. McHenry* and *Lester R. Mosher* for Carmelo A. Rigono, as administrator of the estate of Angela Di Bella, deceased, respondent.

*David H. Perlman* for Consul General of Italy at New York, on behalf of Carmela Di Bella and others, respondents.

PAGE, S. Angelo Di Bella and Angela Di Bella, his wife, together with their fifteen-year-old daughter, Gina Di Bella, met death by asphyxiation in their Vestal Avenue, Binghamton, N. Y. home some time between September 23d and September 26, 1949. Their living quarters were the first-floor apartment of their house. Fred Arrigoni, Binghamton policeman, with his wife and infant daughter, lived in a practically identical apartment on the second floor. As of September 26, 1949, the last they had seen of any of the Di Bella family was on Friday, September 23d. Motivated by this phenomenon, Officer Arrigoni called in two fellow members of the city police department and, with them, broke into the Di Bella apartment. Thereupon, they found the father, mother and daughter lying dead on a bed in a bedroom adjacent to the kitchen. The atmosphere of the apartment was heavily charged with gas. The source of this was readily apparent as having come from the kitchen range, upon which was a kettle containing, or which had contained, glass jars of tomato paste. Some of these jars had burst and their contents had spattered around on various parts of the walls and floor.

Alleging that Angelo's wife, Angela, left no husband her surviving, one of her brothers, Carmelo A. Rigono, applied for and was granted letters of administration upon her estate on the 7th day of October, 1949. Angelo Di Bella left him surviving two children by a previous marriage, Florence Tanzini and Joseph Di Bella. On October 8, 1949, petitioner herein, said Florence Tanzini, was duly appointed administratrix of her father's estate. The theory of the petitioner herein is that, her stepmother, Angela Di Bella's net *personal* estate being less than $10,000, her father, having survived his wife by a very short time, and thereupon and therefore having become her sole distributee (Decedent Estate Law, § 83, subd. 4), her father having since died and she having been appointed administratrix of his estate, that she is, by reason of the provision of section 118 of the Surrogate's Court Act in relation to the grant of letters of administration in a case where a person since deceased, was " entitled to take all the personal estate ", solely entitled to the grant of letters of administration upon the estate of Angela Di Bella, deceased, and that said two children of Angelo Di Bella, deceased, comprise all the distributees of his estate and the devolution thereof must be governed accordingly. The question as to the possible survivorship by Gina Di Bella of either her father or mother or both is not presented by the pleadings,

presumably because, in any event, this question would be academic, since the devolution would not be affected.

The predominant issue is as to whether or not Angelo survived Angela. The right to appointment as administrator of Angela's estate, as well as the devolution thereof, is dependent entirely upon the resolution of this issue.

The petitioner, alleging that one of two who met death in a common disaster was the survivor, unaffected by any presumption one way or another, has the burden of establishing such survivorship by a fair preponderance of all the evidence in the case. · A concise statement of the law governing such situations as it exists in this State and generally throughout English-speaking jurisdictions is: " The burden of proof of survivorship rests on the appellants. The law is settled in this State that there is no presumption of survivorship in the case of persons who die by a common disaster. In the absence of satisfactory evidence of survival, the fact is assumed to be unascertainable, and the property rights are disposed of as if death occurred at the same time, not because of the presumption of simultaneous death, but because of the absence of evidence or a presumption to the contrary ". (See *Matter of McInnes,* 119 App. Div. 440, 441, citing *Newell* v. *Nichols,* 75 N. Y. 78, and *St. John* v. *Andrews Inst.,* 117 App. Div. 698.)

The above indicated common-law rule has been codified. A statute. known as the " Uniform Simultaneous Death Act " has now been enacted in thirty-six States besides New York. In New York, this statute is section 89 of the Decedent Estate Law, the only presently applicable provision of which is its subdivision 1, which reads as follows: " 1. Where the title to property or the devolution thereof depends upon the priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, except as otherwise provided in this section."

The above-cited and other cases whereby the law of this State has become well settled have expressly held that no physical condition such as sex, relative ages or physiques, or the circumstance that one of the two persons whose survivorship of the other is in question was suffering from some malady or any other physical condition which, logically, might seem to be a basis of probability in relation to survivorship, can be considered as constituting the basis of a presumption that the physically superior person survived the other.

Very extensive testimony was taken in the present case. The petitioner contends that, as the composite indication of all the evidence, her burden of proof as to survivorship is sustained by the bearing and effect of each of three main categories of evidence, viz:

(1) The deceased, Angela Di Bella's having been for some years afflicted with the respiratory disease or condition known as asthma, in quite an aggravated form.

(2) Physical differences in the bodies as they were found indicative of the woman's having predeceased the man.

(3) Testimony of a witness, Clare Arrigoni, tending to show that the woman had ceased breathing before the man.

In adjudicating the question as to whether or not the petitioner has adequately supported her burden of proof, we have to examine and appraise each of the three above-stated categories of evidence in order to determine whether, either singly or in combined effect, they or any of them are of a weight sufficient to support the contention of the petitioner.

It is undisputed that the deceased, Angela Di Bella, had been, for several years, a sufferer from asthma, and had been undergoing a particularly severe attack of this malady for a period of two or three weeks immediately preceding the date of the tragedy in question. As to the bearing of this fact upon the issue of survivorship, in all, six doctors testified. Four of the doctors testified in support of the thesis that a chronic asthmatic, hard pressed to supply her physical need of oxygen, when subjected to the additional condition of exposure to carbon monoxide mingled with the air, could not hold out so long as a person having a normal respiratory system.

This first category of evidence is, of course, designed to support the inference that the effect of the asthmatic affliction of Mrs. Di Bella would be that she could not possibly have withstood asphyxiation by carbon monoxide for as long a period of time as would be true in the case of her husband who was free of any such physical ailment and whose respiratory system, presumably, was normal. The weight of the doctors' testimony was to the effect that, because of these facts, with reasonable medical certainty, the wife's death occurred sooner than that of her husband.

There being no presumption of the survivorship of the weaker or diseased by the stronger or more physically fit person, no legal consideration based on public policy is involved. But it is contended by the petitioner that the issue of survivorship, being

free of any and all presumptive considerations and, therefore, an open question, if a difference in potential resistance to the common cause of death seems apparent, and, particularly, if this can be strongly reinforced by medical testimony, then there may well be a basis of inference presented. In this connection, the petitioner relies on such authority as an expression of the Court of Appeals contained in *Newell* v. *Nichols* (75 N. Y. 78, 89, *supra*) viz.: '' If there are other circumstances shown, tending to prove survivorship, courts will then look at the whole case for the purpose of determining the question, but if only the fact of death by a common disaster appears they will not undertake to solve it on account of the nature of the question, and its inherent uncertainty.''

The petitioner also cited Wigmore on Evidence (Vol. 9, § 2532) which states the rule as follows: '' Where two or more persons have perished in the same disaster, there is at common law no presumption of law that either survived the other, or that all perished at the same time. The burden of proving that one survived another will commonly be on any claimant for whom that fact is essential to his own chain of title. If there is evidence, from the age, sex, or physical condition of the persons who perished, or from the nature of the accident and the manner of death of the parties, which tends to show that some one did in fact survive the others, the whole question is one of fact, to be decided in each case by the jury, according to the incidence of the first burden of proof (*ante,* § 2485); but without any rule of presumption.'' In response to this line of reasoning the counter-contention of respondents is that, it being not permissible to indulge any presumption, the court must entirely disregard any and all evidence of the physical superiority of one as compared with the other which, as a matter of nonjudicial reasoning might seem to indicate a likelihood or probability that one survived the other. Even though the taking of this position, in a case wherein expert testimony tending, e.g., to show that it would be highly improbable that an asthmatic person could or would withstand the potentially fatal effect of a gas for as long a time as another free of this condition is adduced, seems to ignore the difference between the stronger species of inferences, known as '' presumptions of law '' as distinguished from circumstantial evidence tending merely to support an inference of fact, there are cases involving similar instances of plural asphyxiations which appear to support this contention. (See *Matter of Englebirt,* 184 App. Div. 314, and *Matter of Burza,* 151 Misc. 577.)

However, in the present instance, there is no necessity of more extensively considering authorities and counter-authorities in this connection. Here we have to take into consideration a special fact strongly tending to negative the inference of survivorship of the husband solely by reason of his having had a normal respiratory system. This is that the conditions of the bodies as found of *both* female members of the Di Bella family indicate that it would, certainly, be impossible to determine, as between those two, which was the survivor of the other. The girl, free of the asthmatic condition affecting her mother, nevertheless, judging by the similar condition of their bodies as found, did not cling to the breath of life any longer than did her mother. At least there is no evidence whatever, by way of a basis for an inference or otherwise, that she did so. From this it appears that, actually, the asthmatic condition of Mrs. Di Bella made no difference in relation to the time of the respective deaths.

If the only basis in evidence tending to indicate the survivorship of the wife by the husband were the fact that she was afflicted with asthma and her husband was not, there would be no tenable ground for the determination of his survivorship of his wife. The utmost that can reasonably be said is that the circumstance that the wife was respiratorily disabled may be in some degree corroborative of other evidence in the case tending to show, as between the two of them, the husband's survivorship.

The second category of evidence is in relation to the physical differences in the bodies of Mr. and Mrs. Di Bella. The testimony in this connection was by the policemen who first entered the apartment, also Joseph W. Sullivan, Captain of Detectives, who came to the apartment shortly after Policeman Arrigoni and the others, Dr. Breivis, the coroner, and Mr. DeMarco, the funeral director. This group of witnesses were in a position to know about the conditions and testified consistently with each other and in great detail concerning them. The two female bodies were swollen or bloated, particularly their heads, to about twice their normal size. Their faces were so discolored and distorted as to be unrecognizable, except, of course, as they were otherwise identifiable. There was a foamy or frothy, bloody exudation from their mouths and nostrils. Decomposition resulting in a stench permeating the apartment had set in to an extent which made it almost intolerable to approach their bodies closely enough for examination. In sharp contrast, the body of the man " looked natural ". His face was normal in color and size. There was no discoloration or bloody froth

observable. It is clear from the evidence that, in his case, the chemical changes incident to putrefaction had not progressed to any degree at all similar to the others.

The circumstance that the apartment was warm and that, because of this condition, the process of dissolution in the case of the wife's body seems to have been accelerated, is of no logical bearing or effect as to the issue of survivorship, for, from the times of their respective deaths, all the bodies had been exposed to the same condition of temperature.

The main explanation offered by respondents as to why there was so much relative difference in the conditions of the bodies of Mr. and Mrs. Di Bella is that he was a man of a lean wiry physique, weighing not more than one hundred-forty pounds, whereas his wife was somewhat obese, estimated by witnesses to have been of a weight of around one hundred-eighty pounds and testified to have weighed one hundred-sixty pounds by Dr. Vencko. There was some medical testimony to the effect that corpulent bodies, other things being equal, yield to the process of decomposition at a faster rate than is true of bodies of lean persons. However, as specifically testified by Dr. Bergstrom, although this condition of relative weight might be somewhat of a factor, it could not be regarded as accounting for the great differences in the bodies in relation to the onset of the process of dissolution. The degree of variation was so great as to indicate a considerable time element, over and beyond any that could rationally be ascribed to the scientific phenomenon, if such it be, that, under the same conditions, an obese body will decompose somewhat faster than a lean body.

Of course, no one knows or can know precisely what transpired in the Di Bella household leading up to the fatal disaster. Opposed conjectures were advanced. It was established by the evidence that Mr. Di Bella, alone, had occupied the front bedroom. The appearance of the bed, his clothing, truss, etc. placed on a chair beside it, indicated very convincingly that Mr. Di Bella had slept in that bed during some of the period of time in question. There was testimony that Mrs. Di Bella had, in effect, stated shortly before the occurrence of the tragedy that she had taken to sleeping with her daughter in the back bedroom so that her husband could get better rest by being in some degree relieved of the disturbance caused by her asthmatic wheezing. From these circumstances, it is argued that Mr. Di Bella was further removed from the source of the atmospheric contamination and that it probably was not until the two women were already dead or nearly so that he, in a stupor induced by the

effect of displacement of oxygen by carbon monoxide in his bloodstream, had staggered into the bedroom where the bodies were found. Also, the evidence shows that his, of the three bodies, was on the side of the bed farthest from the source of the gas and nearest to the bedroom window. Against this theory, an argument, supported by some evidence, is advanced by counsel for respondents that such evidence tends to show that it would be unlikely that either of the women had anything to do about the preparation and canning of the tomato paste; that it was most likely that Mr. Di Bella had been attending to this; that, in so doing, he would have been subjected to the greatest degree of inhalation of carbon monoxide, and, therefore, likely to have been the first to succumb to its effect. Both of these opposed theories are more or less speculative and involve the basing of an inference upon an inference, which process of reasoning, though it is of common practice in the practical affairs of everyday life, is not permissible in the process of reasoning leading to the determination of legal rights. (*People* v. *Kennedy*, 32 N. Y. 141; *Baulec* v. *New York & Harlem R. R. Co.*, 59 N. Y. 356, 366.)

Regardless of which, if either, of these theories might be the more tenable as a matter of ordinary reasoning, even without the aid of any medical testimony, the conclusion seems inescapable that there had been a considerable time difference between the deaths of Mrs. and Mr. Di Bella. In other words, I think it is to be regarded as perfectly obvious that the condition of Mrs. Di Bella's body, as compared with her husband's, proclaimed in no uncertain terms that her life had expired at least several hours earlier than his. Of course, in sustaining her burden of proof, it is entirely unnecessary for the petitioner to show by a fair preponderance of the evidence that the husband survived the wife by any matter of hours. If the proof is sufficient, one second would be enough. (*St. John* v. *Andrews Inst.*, 117 App. Div. 698, mod. 191 N. Y. 254, *supra.*) But it would necessarily have to be in an entirely different factual situation where a survival of only seconds could be shown. Such a fact could hardly be established by merely circumstantial evidence.

The only remaining evidentiary factor necessary of consideration is the testimony of the witness, Clare Arrigoni. She is the wife of Policeman Fred Arrigoni, who rented and resided in the upstairs apartment of the Di Bella house.

Her testimony must be considered in the light of two facts uncontradictably established by the evidence. One of these is that the house in question was of such loose construction,

together with the fact that there were registers in the floor of the second-floor apartment, that ordinary sounds emanating from the first-floor apartment could easily be heard and distinguished by a person of normal hearing in the second-floor apartment. (However, it seems remarkable that there is no suggestion anywhere in the testimony as to why, under such conditions, the gaseous condition of the first-floor apartment was, apparently, not detected by anyone's smelling it in the upstairs apartment.) The other preliminary fact is (as testified by Dr. Williams, called by respondents) that the breathing of a chronic asthmatic has a characteristic " wheezing " or " whistling " sound that can, ordinarily, be heard for quite some distance. It was established by other testimony that Mrs. Di Bella had been undergoing a severe attack of asthma for some two or three weeks before her death. Witnesses other than Mrs. Arrigoni also testified as to the distressing sound her breathing at times when her asthmatic condition was in an acute stage.

Mrs. Arrigoni testified to the effect that she was very familiar with the characteristic sound produced by the asthmatic breathing of Mrs. Di Bella. She had heard it many times. Sometimes it had been while she was in Mrs. Di Bella's own home, visiting her, and at other times she had heard the same sound while they were in their respective apartments.

The witness, Mrs. Arrigoni, testified that her sleep had been disturbed during the night of September 23–24 by the sounds caused by the distressed breathing of Mrs. Di Bella in the apartment below her; that she continued to hear these sounds on the morning of September 24th and operated her vacuum cleaner more to relieve herself of the mental uneasiness caused by hearing them than to perform necessary cleaning of her apartment; that later on the same day, she no longer heard the characteristic wheezing of Mrs. Di Bella's asthmatic breathing, but that, coming from the first floor apartment, she did hear a labored, " hard ", but otherwise normal breathing.

This testimony of Mrs. Arrigoni, unless discredited as a fabrication, although it is itself circumstantial in nature and, therefore, does not contribute any direct element to the body of evidence, is about as close an approach as circumstantial evidence ever can come to the borderline of direct evidence. Instead of a mental impression gained by the sense of sight, this testimony relates to a mental impression gained by the sense of hearing.

If believed, this testimony strongly indicates each of two conclusions. One of these is that the breathing of Mrs. Di Bella had ceased at the time Mrs. Arrigoni heard the other type of breathing. The other is that, in all probability, the hard and labored, but otherwise normal, breathing heard by the witness was that of Mr. Di Bella. While this type of breathing could have been that of the daughter, this hypothesis is most unlikely in view of the fact that the daughter's body lay nearest to the source of the gaseous contamination of the air and the condition of her body indicated that she had not lived appreciably, if any, longer than her mother.

But it is strongly contended by counsel for respondents that this testimony by Mrs. Arrigoni should be regarded as having been thoroughly discredited. The claim is made that the testimony is inherently improbable and also impeached by an inconsistent previous statement of the witness. The claim as the basis of impeachment of this testimony is that it contains statements by the witness upon the trial very different than those made to the Coroner who, as it appears, questioned her briefly on the day the tragedy was discovered.

The claim of inconsistency is not sustained. There was no *inconsistent* statement made to the Coroner. It is, rather, merely the witness' omission to state to the Coroner the details she later claims to have recalled and as to which she testified at the trial. In this connection it must be borne in mind that the Coroner was not concerned at all with the solution of any question of the possible survivorship of one of any other, but only with the cause of death which was very apparent anyhow. From his report, it appears that the questioning of the witness by him was very perfunctory.

Neither can I agree with counsel that inherent improbability characterizes this testimony. It is fairly to be assumed from the record that the slight questioning by the Coroner occurred when Mrs. Arrigoni had first learned of the tragic deaths of her first-floor neighbors. It is natural that it would be after this, rather than before, that she would search her memory and, also, that her recollection would be further stimulated by talking over the event with others. The details of her testimony are natural and not inherently improbable. Her manner of testifying was straightforward and free of any apparent indication of conscious falsification. The suggested possibility that, having heard that her testimony might be helpful to persons she knew instead of others with whom she was not

acquainted, is, especially in the absence of any indicia of any other basis of suspicion of her testimony, not enough to in any way discredit her.

In their combined evaluation, the second and third categories of evidence relied on by the petitioner are sufficient, in my opinion, to constitute a fair preponderance of all the evidence in relation to the issue of survivorship, thus sustaining the contention of the petitioner herein.

Settle decree accordingly by agreement or upon notice.