[Civ. No. 24621.   First Dist., Div. Two.   Apr. 18, 1968.]

Estate of MAX SCHMIDT, Deceased. CLINTON V. ERVIN, JR., as Executor, etc., Petitioner and Respondent, v. ROBERT M. SCHMIDT, Individually and as Administrator, etc., et al., Objectors and Appellants.

Carr, McClellan, Ingersoll, Thompson & Horn, Luther M. Carr, David C. Carr, Gordon & Welch and Steven H. Welch, Jr., for Objectors and Appellants.

Cerf, Robinson & Leland, Bernheim, Sugarman, Gilbert & Straughn and Herbert A. Leland for Petitioner and Respondent.

TAYLOR, J.—After Max Schmidt (hereafter Max) and his wife Patricia were killed in a tragic automobile accident, the executor of her estate filed this proceeding to determine heirship, pursuant to the Uniform Simultaneous Death Act, sections 296-296.8 of the Probate Code. The heirs and administrator of Max's estate appeal from a judgment decreeing that Patricia was the surviving spouse of Max and an heir of his estate, contending that there was no sufficient evidence that Max and Patricia died otherwise than simultaneously, or to determine the order in which they died, and that the trial court erred in its definition of death.

The basic facts are not in dispute. Max and Patricia Schmidt had been married a little over a year and were living at their home in Danville. Max had three adult children (appellants herein) by his former marriage. Patricia had five-and three-year-old sons by her prior marriage who lived with her but had not been adopted by Max. Patricia left a will in favor of her sons and named her father (respondent herein) as executor; Max left no will.

About 5:15 p.m. on December 13, 1964, the white Cadillac in which the Schmidts and Patricia's two sons were riding collided head-on with a maroon Pontiac driven by Edwin Van Sciver on Interstate Highway 680, a two-lane highway near Danville in Contra Costa County. Both vehicles were going at least 55 miles per hour. In each instance, the wives were in the front seat as passengers. Patricia's two small sons were riding in the back seat of the Cadillac. By the time the highway patrol arrived about 5:30 p.m., all six occupants of both cars were determined to be dead.

The sole question presented to the trial court was whether or not there was sufficient evidence that Patricia survived Max during the 15-20 minutes that elapsed between the impact of the collision and the arrival of the highway patrol officers. The trial court's findings were based on the expert

·witnesses' evaluation and interpretation of the facts disclosed by the testimony of the lay eyewitnesses and the autopsy reports. Accordingly, we will set forth these facts in the light most favorable to the judgment.

## The Eyewitnesses

Everett White, an ambulance driver, stated that when he arrived about 5:20 or 5:25 p.m., there were 8 to 15 cars parked at the scene. After seeing that both of the little boys were getting some attention, White first checked Max and felt no pulse or heart beat and no respiration. He then went to the passenger side of the car and could not get the door open. Patricia also had no pulse, heartbeat or respiration, but was bleeding profusely. Max was not bleeding; his face was yellow and his eyes open.

Donald R. Wilcox, a former military policeman trained in accident investigation, saw the flash of the lights of the accident about 5:15 p.m. and was the third car to stop at the scene. He opened the door on the driver's side of the Cadillac and turned the beam of his flashlight on Max. Max's eyes were open but there was no reaction. Wilcox then proceeded to the passenger side of the Cadillac but was unable to open the door. However, through the broken window, he was able to remove a large piece of the windshield that had fallen on Patricia, who was wedged between the dashboard and floor. When he did so, she moved, gasped for breath and made moaning sounds. She was bleeding profusely from both ears. He decided that he could not do anything for her and proceeded to see about the boys and the occupants of the Pontiac. Later, Wilcox returned to the Cadillac and noticed that Patricia had her head all the way up. She had turned quite pale, was gasping in quick deep breaths, and still bleeding from both ears. He took her pulse which was slow but strong, about five beats in a minute and a half. This occurred about 20 minutes after he had first seen the flash of lights from the accident. During the entire time of this witness' observation, Max stayed in the same slumped position on the driver's side of the car. Whenever Wilcox put his flashlight to Patricia's face, her right eye would twitch. Mrs. Wilcox took a brief look and also noted that Max was not moving or breathing at all but that Patricia was breathing and bleeding from her ears.

## The Autopsy Reports

As to Max, the report indicated serious injuries to the chest and heart of the kind frequently observed in steering wheel injuries. The heart was almost completely separated from the

inferior vena cava.[1] A very deep penetration wound through the anterior wall of the left ventricular cavity allowed communication of the left ventricular cavity with the exterior of the heart. The left side of Max's chest contained about 2,500 ml. of deep red blood. Some blood was also found in the right side of the chest. The pericardial sac[2] was lacerated with some blood in its posterior portion. There were numerous rib fractures on each side as well as a complete transverse fracture of the upper portion of the rib cage. Max's lungs were essentially normal in structure. An extensive traumatic lesion over the left side of the face around the left eye extended down across the upper portion of the left cheek and face. The pupils were markedly dilated to a diameter of 6 mm. Both legs were fractured.

As to Patricia, the autopsy report indicated a large amount of blood in the hair and smeared over the face. Blood was also found within the exterior aural canals, the nose and the mouth. The left side of the face was markedly distorted by multiple skull fractures extending across the upper portion of the face in a "butterfly-shaped" laceration, and a fracture below the nasal bridge. The pupils were round and regular, each about 5 mm. in diameter. Patricia's heart was entirely normal in all respects with a small amount of blood from an undetermined source in each side of the chest. There was a rather extensive hemorrhage in the mediastinal[3] connective tissues, especially among the vertebral column. The lungs were normal in structure but quite heavy due to rather extensive stasis[4] of blood within the pulmonary tissues, especially in the posterior segments. There was some blood within the bronchial lumens but of insufficient amount to cause obstruction of the respiratory passages. There was also a fracture of the upper portion of the left leg, just below the knee joint, and of each ankle.

The coroner's report stated that both Max and Patricia died at 5:30 p.m. from cranial and intra-cranial trauma. As both deaths resulted from bodily injuries consistent with a

[1]The blood from the extremities enters the heart from the superior and inferior vena cava, into the right auricle, then to the right ventricle and to the pulmonary artery; thence to the lungs, returning by the pulmonary vein into the left auricle, the left ventricle and the aorta from which it goes out to the extremities.

[2]The watery membrane that encloses the heart.

[3]The mediastinum is the space containing the heart and all of the viscera of the chest except the lungs.

[4]A stoppage of the normal flow of liquid in a vessel of the body.

motor vehicle accident, no intra-cranial examinations or pathological analyses were undertaken.

## THE EXPERT TESTIMONY

The experts agreed that the autopsy reports (undertaken for the coroner's purpose of eliminating unlawful causes of death) were incomplete and that only complete intra-cranial examinations of Max and Patricia would provide the information necessary for a precise determination of the cause of death of each. However, respondent's experts stated that a determination of who died first was possible within reasonable medical certainty and that Max died first.[5]

Most of the experts disagreed with the coroner's conclusions that Max's death was caused by his head injuries and agreed that he died very quickly of the massive injuries to his heart. Max could not have survived the impact of the collision for more than 1-2 minutes. This conclusion was based on the absence of any pulmonary congestion and the time it would take to pump the large amount of blood (nearly half the body's total blood volume) into his chest.[6] The estimates by respondent's experts as to how long the brain could survive without a blood supply from the heart ranged from 2-8 minutes.[7]

As Patricia had no injuries below her neck that could have caused her death, all of the experts agreed that she died of a brain injury. However, there was some disagreement, even among respondent's experts, as to the precise nature of the fatal injury. Dr. Fraser, the Coroner of Contra Costa County with 40 years' experience as a general practitioner, thought that Patricia died of an injury to the pons, the respiratory center of the brain. The stasis in her lungs indicated that her heart was pumping. In his opinion, she survived the impact by 5-10 minutes and was alive when Mr. Wilcox heard her gasp.

Dr. Biskind, a pathologist, stated that Patricia died of a massive intra-cranial hemorrhage as evidenced by the bleeding from the ears. To build up the amount of congestion reported in her lungs, Patricia must have survived the impact by 10-15 minutes.

Dr. Lindsey, another pathologist, indicated that Patricia

---

[5]Most of appellants' experts stated that the autopsy reports were not adequate for a determination of who died first.

[6]Of appellants' experts, only Dr. O'Connor thought that the dilation of Max's pupils indicated a possibility of consciousness for some time.

[7]Estimates of appellants' experts varied from 5-20 minutes.

died from pulmonary congestion resulting from her head injury. If she had died in 1-2 minutes, her lungs would have been normal instead of heavy, as there would not have been time for the blood to back up into the lungs. The kind of pulmonary congestion indicated would require from 5-15 minutes.

Dr. Curphey, a forensic pathologist and Chief Medical Examiner and Coroner of Los Angeles County, stated that Patricia died of a typical severe deceleration accident, in which the odds were 100 to 1 against a primary brain stem injury. The blood in her ears indicated a basal skull fracture[8] and she died of the resulting brain injuries. The low pulse rate observed by Mr. Wilcox was possible in a dying person.

Dr. Courville, an eminent neurologist and neuropathologist, with extensive experience with auto accidents as a result of his work with the Los Angeles County Coroner, testified that she suffered from a typical deceleration injury. To him, the fact that 20 minutes after the accident Patricia bled from her ears was prima facie evidence of a basal skull fracture with resulting brain hemorrhages. He estimated that she could have survived 19-24 minutes after the impact. On the basis of his experience with about 850 cases that went through the same mechanism of injury and death, the basal skull fracture and resulting subdural and subarachnoid brain hemorrhages were the most likely causes of her death.

In Courville's opinion, the fact that Patricia moved her head would rule out a life-depriving fracture of the upper cervical spine (broken neck). If her spinal cord had been crushed, she would not have bled from the ears. To him, the aural bleeding was most significant as the ears are pretty high up as far as the base of the skull is concerned so some degree of pressure and pumping of blood was necessary to bring the blood up that far. In order to make the moans or sounds heard by Wilcox, Patricia must have been breathing. Even assuming the noises and raising of the head after Wilcox moved the windshield to be a reflex action, Patricia could not have a reflex action with a damaged spinal cord or brain tissue. Dr. Courville saw no great significance in the size of Patricia's pupils, as the pupils tend to become enlarged or fixed after death. He had never seen a pulse in a living person as low as that reported by Wilcox but felt it was consistent with the pulse of a dying person.

Two of appellants' experts, Dr. Loquvam, a forensic pathol-

---

[8] A fracture in the floor of the skull on which the brain rests.

ogist for Alameda County, and Dr. Lack, a pathologist for San Mateo County, thought that Patricia died instantly from an injury to her spinal cord, as evidenced by the mediastinal hemorrhage, and that the reflex pumping of her heart accounted for the congestion in her lungs. To them, the gasping breaths, moans and head moving phenomena reported by Wilcox were typical post-mortem reflex movements rather than indications of life. However, they agreed that nothing in the autopsy reports was inconsistent with Patricia's breathing and being alive for 10-15 minutes after the accident.

Dr. Myers testified that Patricia could not have performed any appreciable breathing after the impact. To him, the heaviness of Patricia's lungs was not inconsistent with her instantaneous death. Dr. Morrell, a neurologist, agreed with this interpretation of the pulmonary congestion. In Dr. Morrell's opinion, the pulse rate reported by Mr. Wilcox was not sufficient to sustain life. However, Dr. Myers and Dr. Morrell both agreed that there was no crucial evidence in the autopsy reports inconsistent with Patricia's survival for 15 minutes after the impact. Also, both agreed that the gasping and breathing reported by the Wilcoxes were consistent with life, but interpreted them as post-mortem reflex or release actions.

Dr. Roe, an eminent open heart surgeon (but with relatively little experience with accident victims) stated that the pulse beat reported by Wilcox was not consistent with living. In his opinion, the accumulation in Patricia's lungs could have taken 2-3 minutes and presumably she was alive during that time. He could not tell whether the acts described by Wilcox were voluntary or mere terminal reflexes.

Dr. O'Connor, an eminent neurologist trained in England, stated that Patricia's pupils indicated that she died within a few seconds after the car stopped of a functional severance of the brain stem.[9] The impact of the accident caused the brain stem to be pushed down and functionally severed from its blood supply as the rear of her skull hit the seat and the brain moved around inside the skull. A person with a severed brain stem could not speak and would not be likely to have a heartbeat or be capable of a real movement or breathe, but the other phenomena observed by Mr. Wilcox and the pulmonary congestion were consistent with a severed brain stem.

Dr. Courville, however, stated that he disagreed with the

[9] The brain stem or medulla is a cable about the size of a little finger connecting the upper brain and spinal cord that functions as the communications center of the entire system.

brain stem shearing theory of Dr. O'Connor and other British doctors as it did not conform to his experience. The brain stem lies in an enclosed pocket in a fairly solid part of the skull and is held in place by its attachment and protected by a tent-like membrane. In Courville's experience, brain stem injuries were very rare and if they occurred, the patient usually survived. Out of 2,500 deceleration death autopsies, he never saw one death as the result of a severed brain stem; of the 850 case records he studied in preparation for the instant case, there was only one incidence of a brain stem injury and the patient survived.

Section 296 of the Probate Code provides: "Where the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, except as provided otherwise in this chapter."

The purpose of the Uniform Simultaneous Death Act is to supplant the former arbitrary and complicated presumption of survivorship with effective, workable and equitable rules applicable to the ever-increasing number of cases where two or more persons have died under such circumstances that there is no sufficient evidence to indicate that they have died otherwise than simultaneously (*Azvedo* v. *Benevolent Soc. of Cal.,* 125 Cal.App.2d Supp. 894, 901 [270 P.2d 948]).

Where two or more persons perish in a common disaster and there is no proof as to which died first, the statute furnishes a guide in the absence of evidence by which descent of property may be judicially determined and creates a presumption that death of the parties was simultaneous. However, the statute is inapplicable if there is evidence as to which one of the parties survived the other or if there are particular circumstances from which the fact of survivorship may be inferred. The presumption of simultaneous death of the parties was not intended to take the place of competent, positive and direct evidence and the fact of survivorship requires no higher degree of proof than any other fact in the case (*Sauers* v. *Stolz* (1950) 121 Colo. 456 [218 P.2d 741]).

Accordingly, the cases hold with remarkable uniformity that if there is any sufficient evidence that either party survived the other even when the deaths occur at substantially the same time, the statute is inapplicable and the question of survivorship must be determined as any other fact. The party whose claim is dependent on survivorship has the burden of proving the fact by a preponderance of the evidence. Sur-

vivorship may be established by direct or circumstantial evidence. It is a question of fact to be determined by the trial court and where it is supported by substantial evidence, a finding of survivorship must be sustained on appeal (*Estate of Rowley*, 257 Cal.App.2d 324, 332-335 [65 Cal.Rptr. 139]). If the burden of proof is met, survival by one second is enough to make the statute inapplicable (*In re Di Bella's Estate* (N.Y. 1950) 199 Misc. 847 [100 N.Y.S.2d 763]).

Appellants, citing *In re Cruson's Estate* (1950) 189 Ore. 537 [221 P.2d 892, 20 A.L.R.2d 219], first argue that respondent has not met the burden of proof as there was no substantial evidence that Patricia survived since the testimony of the lay witnesses and the experts provided only a mere possibility, not a probability. We cannot agree.

*In re Cruson's Estate* is not controlling here. In that case, the husband and wife were the victims of an unwitnessed automobile accident when their car plunged into a stream. Seven hours later, their dead bodies, bearing fractured skulls and other injures, were found in different places in the stream. The record did not disclose the cause of death of either of the two people. The appellate court (which, because of the nature of the proceedings, tried the matter de novo) concluded that the evidence submitted was too speculative to establish survivorship and held the statute applicable.

In *Sauers* v. *Stolz, supra,* two laymen examined the unconscious bodies of the victims shortly after the accident. The husband had a slight heartbeat and was spurting blood from his head; the wife had neither of these symptoms. The uncontroverted expert testimony indicated that the spurting of blood from the husband's head in the manner described by the eyewitness indicated heartbeats. The trial court held that there being direct evidence of the husband's survival, there was no occasion for the statutory presumption of simultaneous death.

In *Schmitt* v. *Pierce* (Mo. 1961) 344 S.W.2d 120, the expert testimony, as in the instant case, was in sharp conflict as to the proper conclusions concerning the cause of death to be drawn from the autopsies and slides of the wife's spinal cord. The trial court's finding of survivorship was upheld.

In the instant case, there is no conflict in the eyewitness testimony concerning the fact that Patricia was bleeding extensively from her ears for a period of time after the accident. As to the breathing, gasps and moans, there is some conflict between the testimony of the Wilcoxes and White.

Respondent's experts interpreted the breathing, moans and gasps as signs of life, while appellants' experts saw these phenomena as post-mortem reactions.

As indicated above, there was almost no conflict among all of the experts concerning the cause of Max's death and that he died almost instantaneously. As to Patricia, appellants' experts surmised that she also died instantaneously of an injury to her brain stem or a crushed spinal cord, basing their opinions on the condition of her pupils and the mediastinal hemorrhage. However, they admitted there was nothing in the testimony of the lay witnesses or the autopsy reports that was inconsistent with Patricia's survival and breathing for 10-20 minutes after the impact. Several of respondent's experts stated that the amount and type of congestion in Patricia's lungs would take 10-15 minutes.

Respondent's medical experts, basing their opinions chiefly on the uncontroverted heavy bleeding observed by all of the eyewitnesses and further established by the condition of Patricia's lungs, surmised that Patricia did not suffer a brain stem severance or spinal cord injury, but died more slowly from a severe basal skull fracture. Dr. Courville stated that the bleeding from the ears was prima facie evidence of such a fracture, and that the blood would have to be pumped up into the aural canals. He also controverted appellants' theories of brain stem or spinal cord injuries, by indicating that the former were very rare and usually not fatal, while the latter would have precluded any head movements or post-mortem reflexes. He further stated that the sounds heard by Mr. Wilcox required the passage of air through the vocal cords, which was evidence of breathing. Patricia's breathing for 10-15 minutes was completely consistent with the congestion noted in her lungs.

It is within the exclusive province of the trier of fact to determine the credibility of experts and the weight to be given to their testimony. Where there is conflicting expert evidence, the determination of the trier of fact as to its weight and value and the resolution of such conflict are not subject to review on appeal (*Estate of Rowley, supra,* at p. 341),

We conclude that there was sufficient evidence to support the trial court's conclusion that Patricia died of a basal skull fracture and survived Max by 10-15 minutes.

In view of the above, we need not discuss in detail the remaining contention on appeal, namely, that the trial court erred in the definition of death it used to determine the ques-

tion of survivorship. The trial court's excellent and helpful memorandum opinion stated: "Medical opinion in this case varied as to when death occurred. In the opinion of the medical experts death might be the inability to resuscitate or an irreversible coma. However, for purposes of this decision this Court considers death as defined in Black's Dictionary, Third Edition: 'as the total stoppage of the circulation of the blood and cessation of the animal and vital functions of the body such as respiration and pulsation.'" The above definition is that used by the California courts (*Thomas* v. *Anderson*, 96 Cal.App.2d 371 [215 P.2d 478]) and the Missouri court in *Schmitt* v. *Pierce, supra*.

Appellants argue that the above definition is an anachronism in view of the recent medical developments relating to heart transplants. They contend that the trial court should have accepted and used Dr. O'Connor's definition of death as the inability to resuscitate. However, this contention, while interesting, has no relevance to the facts of the instant case, as there was no evidence that Max was resuscitable during the period of time in question.

Affirmed.

Shoemaker, P. J., and Agee, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied June 11, 1968.