LAW AND EQUITY COURT OF THE CITY OF RICHMOND

William E. Tucker, Administrator of
the Estate of Bruce 0. Tucker, deceased

> v.

Dr. Richard R. Lower
Dr. David M. Hume
Dr. David H. Sewell
Dr. H. M. Lee and
Dr. Abdullah Fatteh

May 23, 1972

Case No. 2831

By JUDGE A. CHRISTIAN COMPTON

The evidence of the plaintiff in his case in chief having been completed, the court now must rule on the defendants' respective motions to strike the evidence of the plaintiff and to enter summary judgment in their favor. Rule 3:18.

The rule of decisions applicable to the motion to strike the evidence made at the conclusion of the plaintiff's evidence requires the trial court in considering such motion to overrule it in every case except where "it is conclusively apparent that [the] plaintiff has proven no cause of action against the defendant[s]." Gray v. Van Zaig, 185 Va. 7, 10 (1946).

In this case and at this stage of the proceeding, the court has concluded to overrule the several motions to strike.

A summary of the evidence is essential to properly focus upon the issues of law herein.

The facts thus far are, in the main, uncontradicted. The decedent, Bruce O. Tucker, age 54, was brought unconscious to the emergency room of the Medical College of Virginia Hospital by the personnel of a local ambulance company on Friday, May 24, 1968, and was registered therein at 6:05 p.m. He had suffered a fall at another location in the City, and the evidence shows that he was not accompanied to the hospital by any relative or friend.

Upon examination, the decedent was found to have sustained severe head injuries, including a large right-sided lateral basilar skull fracture. He was admitted to the neurosurgical service of the hospital and upon further examination and tests, a diagnosis of subdural hematoma on the left and brain stem contusion was made prior to the performance at 11:00 p.m. on May 24 of an operation described as a right temporoparietal craniotomy and right parietal bur hole. A tracheostomy was also performed at the same time.

Following this operation, which was completed about 2:05 a.m. on May 25, the decedent left the operating room in slightly better condition than preoperatively and was placed in the recovery room, where he was to remain until the afternoon of that day.

In the recovery room he was being fed intravenously and he was receiving medication each hour until 11:30 a.m., when he was placed on a respirator, which kept him "mechanically alive." At 11:45 a.m. the treating physician, Dr. Brawley, noted that "[his] prognosis for recovery is nil and death imminent." At 1:00 p.m. on that day, Dr. Hooshmand, a neurologist, was called upon to obtain an EEG to determine the state of the patient's brain activity. Between 1:00 p.m. and 2:00 p.m. he examined the decedent and made a single EEG recording which showed flat lines with occasional artifact. He found no clinical evidence of viability and no evidence of cortical activity.

Based upon this examination, he was of the opinion that the patient was then dead from a neurological standpoint.

At this time, the neurologist also found that the decedent's heart was beating and that his body temperature, pulse, and blood pressure were all normal for a patient in his condition. In addition to theological death, the neurologist defined two other types of death. First, he defined clinical or neurological death as total cessation of function of the central nervous system or brain. He then defined biological death as the death of an organ or a part of the body or a cell. He described death as a continuing thing since tissue and organs live after the brain dies, but he stated that in his opinion the individual dies when the brain dies. In his opinion, the decedent's brain was dead prior to the time he ran the EEG. The patient showed no evidence of being able to breathe spontaneously at all. The respirator was doing all the breathing, he said.

Dr. Hooshmand was of the opinion that it was "very likely" the decedent's condition was "irreversible" at the time the patient was admitted to the hospital on May 24.

At 2:45 p.m., the decedent was taken back into the operating room in preparation for the removal of his heart and both kidneys, this being the operation participated in by the defendants Lower, Hume, Sewell and Lee.

Sometime before 2:45 p.m., Dr. Campbell was requested to give anesthesia in the form of oxygen to the decedent during the operation. The patient was receiving oxygen to continue viability of certain organs. Dr. Sewell had told Campbell after 12:00 Noon on that day that his services would be needed because "we have a prospective donor for a heart transplant."

From the time (2:45 p.m.) that the patient was taken from the recovery room to the operating room, until 4:30 p.m., he maintained vital signs of life,

that is, he maintained, for the most part, normal body temperature, normal pulse, normal blood pressure and normal rate of respiration. During the same period, he was receiving dextrose and saline to furnish nourishment to the organs.

At 3:30 1/2 the respirator was cut off by Dr. Bralley and at 3:35 1/2 the patient was pronounced dead by Dr. Bralley. At 4:25 the incision was made to remove the heart and it was taken out at 4:32 p.m. by Dr. Sewell, who was assisted by Dr. Hume. The heart was then placed in the body of the recipient, Joseph Klett, by his treating physician, Dr. Lower, who had made the incision in Klett at 3:33 p.m.

At 4:33 p.m. the incision was made by Dr. Lee to remove the decedent's kidneys. The left kidney was out at 4:39 p.m. and the right kidney was out at 4:46 p.m.

Dr. Hume, Chief of Surgery at the hospital and who specializes in general surgery, vascular surgery and transplantation surgery, discussed the transplantation of the decedent's heart following the surgical meeting about 9:30 a.m. on May 25 with the defendants Fatteh, Lower and Lee, among others. When he was later apprised that Tucker had suffered neurological death, he again called the defendant Fatteh, who was acting for the State Medical Examiner. Fatteh advised Hume to attempt to locate the decedent's family to obtain permission to use the organs. Thereupon, about 2:00 p.m. on May 25, Hume sought the aid of the Richmond Police in locating relatives of the deceased at the address shown on the hospital chart, 109 East Charity Street, Richmond, Virginia. Hume was aware that an earlier attempt had been made to locate the decedent's family with no success. The police were unable to locate any relative and Fatteh was called again to obtain authority to use the decedent's heart and kidneys. Since the decedent was unconscious from the time he arrived at the hospital, no information as to the whereabouts of his relatives had been obtained from him nor was any consent for any surgical procedure given by him.

Fatteh told Hume to call him again after the patient was pronounced dead, which was done shortly after 3:35 p.m., and permission was then given by Fatteh to use the heart and kidneys.

During the period from 1:45 p.m. to nearly 3:00 p.m., a close friend of the deceased was searching for him and made inquiry at three of the hospital information desks, all without success. The decedent's brother, the plaintiff here, was at his place of business, located within 15 city blocks of the hospital, all day on May 25 until he left his business to go find his brother in the afternoon when he heard he had been injured. Among the personal effects turned over to the brother later was a business card which the decedent had in his wallet which showed the plaintiff's name, business address and telephone number thereon.

The defendant Lower, Chairman of the Department of Thoracic Surgery at the hospital, learned that the decedent was a potential donor for his patient Klett shortly after midnight on May 25 when he reviewed the decedent's chart in the area of the operating room on the eleventh floor. After the regular surgical meeting about 9:30 a.m. on May 25, Dr. Lower contacted Dr. Hume and the possibility of a transplant was discussed as heretofore stated. After checking on the decedent's condition then and later after the neurologist had made his findings about 2:00 p.m., he notified the surgical team to be prepared for the Klett transplant.

As stated, the Klett operation was commenced at 3:33 p.m. and upon the pronouncement of death by Bralley and based upon the permission of Fatteh to use the heart of the deceased, Lower completed the transplantation of Tucker's heart into Klett's body.

Doctors Lee and Sewell participated in the preparations for the removal of Tucker's organs and performed the surgery as heretofore discussed.

In addition to the evidence relating to the viability of the organs which can and does occur with

mechanical and other assistance long after the brain ceases to function, the plaintiff also presented evidence from which a jury could properly infer that had the respirator not been cut off and had his heart and kidneys not been removed Tucker could have lived at least a day or probably longer.

Having viewed the evidence in the light most favorable to the plaintiff, as the court is bound to do at this stage of the proceeding, it is apparent to the court that the plaintiff has established a prima facie case for recovery under the Virginia Death by Wrongful Act Statutes. Code, §§ 8-633 et seq.

The plaintiff has not, however, made out any case of medical malpractice in the customary and strict sense of that term. The duty of the physician or surgeon to exercise reasonable and ordinary care and diligence in the exertion of his skill and application of his knowledge as to the treatment of the case entrusted to him is usually based upon the contractual relationship between the patient and his physician. 61 Am. Jur. 2d Physicians and Surgeons, Section 110, page 230. See also 14 M.J. Physicians and Surgeons, Section 12, page 424. As the defendants point out, none of them had the relationship to Bruce 0. Tucker of a treating physician. Therefore, unless there is some other basis for liability of these defendants, the plaintiff has not made out a case and his action must fail.

This action, as stated, is brought under the Virginia Death by Wrongful Act Statute. It states in Code § 8-633, in part, as follows:

> Whenever the death of a person shall be caused by the wrongful act . . . of any person . . . and the act . . . is such as would, if death had not ensued, have entitled the party injured to maintain an action . . . and to recover damages in respect thereto, then, and in every such case, the person who . . . would have been liable, if death had

not ensued, shall be liable to an action for damages . . .

The first important consideration, then, raised by the facts of this case and the argument of the defendants in support of their motions relates to the meaning of the word "death" as used in the statute. Under the law, does death occur at a particular moment in time or is it continuing? This determination must necessarily include a decision by the court upon the question of whether death must be defined by the law or whether the definition must be controlled entirely by, or in part by, medical opinion.

The function of this Court is to determine the state of the law on this or any other subject according to legal precedent and principle. The courts which have had occasion to rule upon the nature of death and its timing have all decided that death occurs at a precise time, and that it is defined as the cessation of life; the ceasing to exist; a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereto such as respiration and pulsation. Black's Law Dictionary, Fourth Edition, page 488 (1968); Schmitt v. Pierce 344 S.W.2d 120, 133 (Mo. 1961); Smith v. Smith 317 S.W.2d 275, 279 (Ark. 1958); Thomas v. Anderson 215 P.2d at 482 (Cal. App. 1950); In re Schmidt's Estate 67 Cal. Rptr. 847, 854 (Cal. App. 1968); Estate of Rowley 65 Cal. Rptr. 139, 146 (Cal. App. 1967). See also Kusanovich, Medical Malpractice Liability and the Organ Transplant, 5 U. S.F. L. Rev. 241 (April, 1971). The lay definition of the time of death recognizes that it occurs at the "ending of all vital functions without possibility of recovery either in animals or plants or any parts of them; the end of life; . . ." (emphasis added). Webster's Third New International Dictionary, unabridged, page 581 (1968).

This court adopts the legal concept of death and rejects the invitation offered by the defendants to employ a medical concept of neurological death in establishing a rule of law.

While it is recognized that none of the cases cited above involved transplants, to employ a different standard in this field would create chaos in other fields of the law and certainly it cannot be successfully argued that there should be one concept of death which applies to one type of litigation while an entirely different standard applies in other areas.

For example, in the criminal law, if the defendants' concept of neurological death were adopted, a defendant could be indicted for murder, tried and perhaps executed while the victim had not ceased to exist, his other vital signs of life being normal because he was being maintained for days or years by mechanical means. Moreover, should a life insurer be required to pay the proceeds of its policy upon the neurological death of its insured when all vital functions of the insured have not ceased but continue for an extended period of time? Furthermore, may the wife whose husband has suffered only neurological death remarry without being guilty of the crime of bigamy which, in Virginia, is defined as the marriage by any married person to another "during the life of the former husband or wife"? Code, Section 20-41. (emphasis added)

In addition, under "The Uniform Partnership Act" adopted in Virginia, would a partnership be dissolved by operation of law upon the neurological death of a partner when the law provides that dissolution is caused by, inter alia, "the death of any partner"? Code, Section 50-31(4).

The problems of apparent simultaneous death relating to the disposition of property under wills are discussed in the cases heretofore cited. To recite more examples of the instability in the law which would obtain if a definition of death as urged by the defendants were now adopted by this Court would be only repetitious. If such a radical change is to be made in the law of Virginia, the application should be made therefor not to the courts but to the legislature wherein the basic concept of our society relating to the preservation and extension of life could be exa-

mined and, if necessary, reevaluated. Kansas has taken such action. In 1970 its legislature enacted the following definition of death:

> A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous respiratory and cardiac function and, because of the disease or condition which caused, directly or indirectly, these functions to cease, or because of the passage of time since these functions ceased, attempts at resuscitation are considered hopeless; and, in this event, death will have occurred at the time these functions ceased; or

> A person will be considered medically and legally dead if, in the opinion of a physician, based on ordinary standards of medical practice, there is the absence of spontaneous brain function; and if based on ordinary standards of medical practice, during reasonable attempts to either maintain or restore spontaneous circulation or respiratory function in the absence of aforesaid brain function, it appears that further attempts at resuscitation or supportive maintenance will not succeed, death will have occurred at the time when these conditions first coincide. Death is to be pronounced before artificial means of supporting respiratory and circulatory function are terminated and before any vital organ is removed for purposes of transplantation.

> These alternative definitions of death are to be utilized for all purposes in this state, including the trials of civil and criminal cases, any laws to the contrary notwithstanding. § 77-202, Kansas Statutes Annotated.

As stated, the court adopts what it believes to be the legal definition of the word "death" contemplated by the Virginia statute sued upon and will instruct the jury accordingly.

The defendants point out that the Uniform Anatomical Gift Act was enacted in Virginia in 1970 and that therein (Code § 32-364.9[b]), the time of death shall be determined by a physician who attends the donor at the time of death or, if none, by the physician who certifies the death. They argue that the court should be persuaded to incorporate a similar provision as the rule applicable to this cause of action which arose in 1968. This argument would have some merit if Bruce 0. Tucker had made a gift of a part or all of his body within the meaning of the Act. In this case, neither the decedent nor anyone acting on his behalf had made a gift of any part of his body so Tucker cannot be classed as a "donee." See Note, Providing Human Organs for Medical Transplant, 26 Wash. & Lee L. Rev. 58 (1969).

In view of what has been said above, the issues in the case at this point relate, in part, to causation. The jury will be allowed to consider whether the decedent's death occurred as the direct result of the acts of the defendants, or any of them, or whether death resulted from the injury sustained in the fall.

If the jury concludes that the decedent's life was terminated at a time earlier than it would ordinarily have ended had all reasonable medical efforts been continued to prolong his life, then it will be allowed to assess damages not only for the pecuniary loss, if any, sustained by the statutory beneficiary, but also for the loss, if any, of the decedent's society as well as solatium to the beneficiary for his sorrow and mental anguish caused by the death. Breeding, Admr. v. Johnson, 208 Va. 652, 659 (1968).

Finally, the nature of the wrongful act, if any, which may impose liability upon the defendants should be discussed. In the absence of emergency conditions or unanticipated conditions, a surgeon must

obtain the consent of the patient, if he is competent to give it, or of someone legally authorized to give it for him, before operating on him. A surgical operation on the body of a person is a technical battery or trespass unless he or some authorized person consented to it. 61 Am. Jur. 2d Physicians and Surgeons, etc., Section 129, page 260, ftn. 20, and Sections 151 and 155.

The decedent here was unable to consent. The defendants acted upon Dr. Fatteh's permission which he had authority under the law to give only if the body was unclaimed. Code § 19.1-46.1 became effective on July 1, 1968. It now gives the Chief Medical Examiner or his deputies the authority to grant permission to use organs for transplant without contacting the next of kin under certain circumstances. Fatteh and the other defendants claim that they are protected by Code § 32-356, in effect at the time, regarding the use of dead bodies for scientific study. The provisions of that chapter of the Code set forth specific requirements relating to the use of dead bodies. Not only does the body have to be a dead one, but it must be unclaimed. In this case, the jury must determine whether proper care was used under the circumstances in connection with notifying or seeking Tucker's relatives to determine in fact whether the body was "unclaimed" so as to authorize Fatteh to give permission and, in turn, the jury shall consider whether the other defendants had proper authority to use the body "for the advancement of medical science," in the words of the statute.

For these reasons, the several motions to strike are overruled.