John J. Dillon, S.
In a previous decision in this proceeding (13 Misc 2d 640), the court reserved the determination of one of the questions presented for construction pending the taking of factual proof, without which the question could not be resolved. The evidence available on the subject has since been presented.
The problem has its origin in articles ‘1 twenty-ninth ’ ’ and “ thirtieth ” of the will, which in general create five trusts, each comprising one fifth of the residuary estate. The income beneficiaries of these trusts are five nieces of the testatrix. We are concerned here with the two trusts created by sub-paragraphs “A” and “B” of article “ twenty-ninth ”, in which the named income beneficiaries are Josephine H. McCann and Mary Jane McCann. In each case it is provided by article *86 “ twenty-ninth ” that upon the death of the life beneficiary the remainder shall be paid to her issue then living per stirpes.. Article ‘( thirtieth ’ ’ directs, in effect, that the remainders, if undisposed of under the previous provisions of the will, shall be distributed as in intestacy.
Josephine H. McCann married one Paul Warwick, and had no children. Mary Jane McCann never married and died childless. It therefore becomes necessary to determine who were the distributees of the testatrix at the termination of the respective trusts. Josephine McCann Warwick and Mary Jane McCann both died by violence on August 1, 1957. If it can be demonstrated that either predeceased the other, the estate of the survivor would be entitled to a distributive share of the remainder of the other’s trust, while the estate of the one first dying would retain no interest in either trust.
The proof may be summarized in this fashion:
For some time prior to the tragedy, Josephine McCann Warwick had been separated from her husband. She and her sister, Mary Jane McCann, lived with their mother in Landsdowne, Pennsylvania, and Paul Warwick occupied an apartment in a four-family house in the same community. On August 1, 1957 Josephine received a check drawn to the order of herself and her husband. At about 8 o’clock that evening she started for her husband’s apartment, apparently to obtain his indorsement on the check. She was accompanied by her sister, Mary. On the previous day Paul Warwick had purchased a .38-calibre Smith and Wesson revolver. When neither woman had returned home by 10:30 p.m., their mother went to the apartment to investigate. She found both of her daughters and her son-in-law shot to death. It was obvious that Paul Warwick had killed his wife and “sister-in-law and then committed suicide. Although there were no witnesses to the actual occurrence, the court has concluded that it may reasonably be inferred, from the physical circumstances and the opinion evidence offered at the trial, that Josephine McCann Warwick died before her sister, Mary McCann.
Paul Warwick occupied a second-floor apartment consisting of a small vestibule, a private hall, three rooms and a bath. Outside the apartment there is a public hall leading to the stairway. The body of Josephine McCann Warwick was found lying in the public hallway near the top of the stairs. She had been shot four times, once in the hand, one in the right shoulder, once through the back, and once through the back of the head. A fifth bullet, apparently fired at Josephine, was found wedged *87 in the floor. The police surgeon testified that an examination of Josephine’s four wounds indicated that she had received all of them while still in an erect position. There were no powder marks on any of the wounds. It is therefore proper to conclude that all four shots which struck Josephine had been fired in rapid succession and before she fell, and that the weapon had not been held in close proximity to her body. The same medical witness testified that the wounds in the finger and shoulder were superficial; that the shot in the back (which had passed through the left chest but had missed the heart) might have proved fatal but not immediately so; and that the wound through the head would have caused instantaneous death.
Mary Jane McCann was found inside the apartment, lying on her back on the living room floor. She had been shot twice, once in the back and once through the head. The bullet causing the latter wound had passed completely through the head and was found imbedded in the floor directly beneath her. There were powder burns on this wound, indicating that the gun had been held at close range when the shot was fired. It is a necessary conclusion also that the shot which struck her in the back had been fired before the other, since the victim could not have been shot in the back while lying face upward on the floor. Here again the police surgeon expressed the opinion that death would have followed instantly from the head wound but not from the shot in the back.
Paul Warwick was found sprawled face downward across and at right angles to the body of Mary Jane McCann. He had been shot in the head. The gun lay within a few inches of his hand. When examined by the police, it was found to contain four live shots. Bight shots had been fired, five at Josephine (of which four took effect), two at Mary, and the self-inflicted shot at Paul Warwick. Since the revolver had six chambers, it is a certainty that somewhere in the course of the violent scene the assailant had taken the time to reload the gun to its full capacity. The latter fact is of paramount importance.
If the court accepts, as it should and does, the uncontradicted opinion of the only medical witness that in both cases the head wounds and no others would have caused immediate death, the issue is reduced to this: Is there sufficient evidence from which a conclusion can reasonably be drawn as to which of the two women first received the one shot which proved fatal?
There are only two possible alternatives, both of which may be examined in the light of the available evidence. Let it be assumed as one alternative that Mary was the first to receive *88 the fatal head wound. It has already been pointed out that she had previously been shot in the back. If, as a result of that initial wound, she had then fallen on her back (as the position of the body indicated), and Warwick had then shot her through the head and killed her, he would have had only four bullets left in the revolver. Yet he fired five shots at Josephine. This hypothesis leads to the highly improbable assumption that in the midst of a rapid fusillade at Josephine, he had stopped to reload the gun. The improbability of such an assumption is emphasized by the fact that all four of the shots which struck the victim had been received while she was still erect. If we follow the hypothesis a step further, and assume that Warwick shot his wife four times, thereby emptying the gun, and had then reloaded the gun and fired the fifth shot which missed her, we are left with the conclusion that the only time he missed his target was when it lay, already motionless and dead, before him.
The hypothesis that Josephine was the first to die presents no such difficulties. It assumes only that Warwick, starting with a fully loaded revolver, shot five times at his wife; and that either during the process or immediately thereafter he had turned the gun upon Mary and shot her in the back with the sixth shot. At that point Josephine would be dead from the head wound and Mary would be lying wounded on the floor from the wound in her back. Wárwick would then have reloaded the revolver, shot Mary through the head, and then shot himself. This conclusion follows naturally and logically from the evidence.
Other circumstances are wholly consistent with the conclusion reached, though not decisive in themselves. It seems probable that Warwick’s separated wife, rather than her sister, would be the first object of his homicidal purpose. The position of her body in the outer hall at the head of the stairway, while both of the other actors were still within the apartment, indicates that Josephine was engaged in a desperate attempt to flee. Under these circumstances, the immediate reaction of Warwick would be to turn the gun upon his wife to prevent her escape, and turn his attention later to Mary who was still within the apartment.
Of course, the.proof is wholly circumstantial as it normally must be in a situation of murder and suicide. The rule as to the quality of circumstantial evidence is a familiar one. ‘ ‘ The circumstances themselves must be shown and not left to rest in conjecture, and when shown it must appear that the inference *89 sought is the only one which can fairly and reasonably be drawn from these facts.” (Ruppert v. Brooklyn Heights R. R. Co., 154 N. Y. 90, 94.) The court believes that these standards have been met in the present case. In view of certain objections raised at the trial, it may be said that the ultimate fact does not have to be established to a certainty or beyond a reasonable doubt. The evidence is sufficient if an inference can be drawn “ fairly and reasonably ” to the exclusion of all others.
In view of the conclusion as to survivorship, we do not reach the question of whether section 89 of the Decedent Estate Law might apply under other circumstances.
The court therefore finds that Josephine McCann Warwick predeceased Mary Jane McCann, and that the estate of Mary Jane McCann is one of the distributees of the trust created by subparagraph “A” of article “ twenty-ninth ”, of the will.
Settle decree accordingly.