IN the MATTER OF the ESTATE of Roy A. VILLWOCK, Deceased: Mary A. HINTZ,† Petitioner-Appellant,

v.

Richard OLINGER, personal representative of the Estate of June Rose Villwock, Respondent. [Case No. 86–1984.]


IN the MATTER OF the ESTATE OF June Rose VILLWOCK, Deceased: Mary A. HINTZ, Petitioner-Appellant,

v.

Richard OLINGER, personal representative of the Estate of June Rose Villwock, Respondent. [Case No. 86–1985.]

Court of Appeals

*Nos. 86–1984, 86–1985. Submitted on briefs September 1, 1987.—Decided November 3, 1987.*

(Also reported in 418 N.W.2d 1.)

† Petition to review denied.

For petitioner-appellant there was a brief by *George W. Love* of *Love, Voss & Dreyfus,* Waukesha.

For respondent there was a brief by *Daniel W. Stevens* of *Charlton & Esser Law Firm,* Milwaukee.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. Mary Hintz, Roy Villwock's daughter by a previous marriage, appeals an order that her father's estate be probated in accord with the trial court's finding that Roy preceded his wife, June, in death. The effect of the order is to pass Roy's entire estate to June's estate and in turn to June's heirs as directed by her will. The trial court's determination of the time of Roy's death is a finding of fact and is not clearly erroneous. Section 805.17(2), Stats. Because the trial court found that Roy died before his wife, the

provisions of the Uniform Simultaneous Death Act, sec. 851.55(1), Stats., are inapplicable. We affirm.

Roy and June Villwock, critically injured but alive and conscious after a head-on car crash on July 25, 1985, were transported together to a Rhinelander hospital. All five emergency medical technicians on board agreed that Roy suffered cardiopulmonary failure minutes before June similarly failed. Upon arrival at the hospital, each was taken to a separate treatment room where CPR, begun in the ambulance, was continued. A physician eventually pronounced June dead at 8:23 p.m. Another physician, Dr. Bruce Kotila, after giving advanced CPR to Roy, pronounced him dead at 8:34 p.m.

A probate hearing was held to determine the time of Roy's death. Dr. Kotila testified that Roy's heart and lung failure in the ambulance was irreversible despite the efforts to revive him. The trial court accepted Dr. Kotila's testimony and found that Roy died in the ambulance, while his wife was undisputedly still alive and conscious. Roy's will left everything to June and contained no contingency that she need survive him any period of time in order to take under the will. There were no other dispositive provisions in the will. There were no children born to the marriage of Roy and June. June's will left everything to specific members of her family.

Section 146.71, Stats., provides:

> **Determination of Death.** An individual who has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death shall be made in accordance with accepted medical standards.

Prior to the adoption of this statute in 1981, the Wisconsin courts declined to define death. *Cranmore v. State,* 85 Wis. 2d 722, 774, 271 N.W.2d 402, 428 (Ct. App. 1978). The Wisconsin statutory definition of death adopts the uniform Act approved by the National Conference of Commissioners on Uniform State Laws.[1]

Modern advances in life-saving technology have prompted adoption of this uniform law. *See* Prefatory Note to Uniform Determination of Death Act, 12 U.L.A. 286 (Supp. 1986). The statute allows for two alternative definitions of death. We are only concerned here with the first alternative, which essentially codifies the common law: death is the irreversible failure of the cardiorespiratory system.[2]

Hintz contends that Dr. Kotila's testimony determining Roy's time of death must be disregarded as a matter of law because it is contradictory and speculative. She then concludes that, under the terms of the Uniform Simultaneous Death Act, sec. 851.55, "there is no sufficient evidence that [Roy and June] have died otherwise than simultaneously."[3] We reject her argument.

---

[1]The Act was endorsed by the American Bar Association, the American Medical Association, and recommended by a presidential commission. Defining Death, President's Comm'n for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research (1981). This Act has been adopted in at least twenty-two other jurisdictions.

[2]The facts of this case eliminate the necessity of any discussion of "brain death." *Cf. In re Bowman,* 617 P.2d 731 (Wash. 1980)(removal of respirator on child with no brain functions).

[3]Section 851.55(1), Stats., provides:

If the title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the

Dr. Kotila's original death pronouncement of 8:34 p.m. conflicts with his ultimate opinion that death occurred earlier in the ambulance. There also is arguably an inconsistency between his ultimate opinion and his administration of advanced CPR for an hour at the hospital. Dr. Kotila, however, offered explanations for these conflicts. Dr. Kotila explained that his original death pronouncement was not intended to preclude a reevaluation to establish death at an earlier time. Given the demands upon an emergency room physician in a time of crisis, it is not difficult to accept his explanation. Dr. Kotila also explained that CPR was continued for an hour or more to preclude any possibility of an erroneous judgment of death made in haste. This explanation is not incredible as a matter of law. The determination of credibility is the sole province of the trial court. *Estate of Sensenbrenner v. Sensenbrenner,* 89 Wis. 2d 677, 700, 278 N.W.2d 887, 898 (1979).

Hintz further insists that it is beyond the ability of any medical scientist to fix at a precise moment in time when cardiopulmonary failure was "irreversible." Dr. Kotila testified, however, that the extent of a person's injuries is "a very big factor" in deciding irreversibility. Roy's injuries were undisputedly extensive.

The drafters of the Uniform Determination of Death Act contemplated disputes over irreversibility. The determination of death must be made in accordance with accepted medical standards. "This Act is

persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he or she had survived, except as provided otherwise in this section.

silent on acceptable diagnostic tests and medical procedures. It sets the general legal standard for determining death, but not the medical criteria for doing so. The medical profession remains free to formulate acceptable medical practices and to utilize new biomedical knowledge, diagnostic tests, and equipment." Prefatory Note to Uniform Determination of Death Act, 12 U.L.A. at 287.

Dr. Kotila is a licensed physician, board certified in internal medicine with nine years' experience in emergency room practices. Although the trial court did not explicitly find that the medical evidence was in accord with accepted standards, it did so implicitly. This court may assume that a missing finding was determined in favor of the order or judgment. *Sohns v. Jensen,* 11 Wis. 2d 449, 453, 105 N.W.2d 818, 820 (1960). Based upon the qualifications of the expert witness and the fact that his opinion was unchallenged by any other witness or evidence, we will assume that the trial court found that the determination of death was in accord with accepted medical standards.

Given the few minutes between Roy's cardiopulmonary failure and that suffered by June, the margin for error, when measured by time, is admittedly narrow. The narrow margin for error is no reason to reject the trial court's fact finding.

> The problem is that the facts are forever gone and no scientific method of inquiry can ever be devised to produce facsimiles that bring the past to life. The judicial process deals with probabilities, not facts, and we must therefore be on guard against making fact skepticism our main preoccupation. However skillfully, however sensitively we arrange

a reproduction of the past, the arrangement is still that of the theater. We acknowledge as much when we speak of re-enacting the crime or the accident or perhaps some everyday event; we know better than to speak of reliving it. The most we can hope for is that witnesses will be honest and reasonably accurate in their perception and recollection, [and] that triers of fact will be honest and intelligent in their reasoning, ....

R. Traynor, *Fact Skepticism and the Judicial Process,* 106 U. Pa. L. Rev. 635–36 (1958). The "fact" of the time of Roy's death has been adequately established in this case.

■

The Simultaneous Death Act is inapplicable. The Villwocks did not die simultaneously. The statute's nontechnical words, if not specifically defined, will be given their ordinary and accepted meaning, which may be ascertained from a recognized dictionary. *State v. Wittrock,* 119 Wis. 2d 664, 670, 350 N.W.2d 647, 651 (1984). Webster's Third New International Dictionary 2122 (1975) defines "simultaneous" as "occurring at the same time ...." Based on the trial court's finding, the deaths here did not occur at the same time.

*By the Court.*—Order affirmed.