2001 OK CIV APP 136

In the Matters of the ESTATES OF Hubert M. PERRY, deceased, and Ruth L. Jones–Perry, Deceased,

Rich D. Jones, Personal Representative of the Estate of Ruth L. Jones–Perry, Petitioner/Appellee,

v.

James Fred Hill, Personal Representative of the Estate of Hubert M. Perry, Respondent/Appellant.

No. 94,940.

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 10, 2001.

Certiorari Denied Oct. 8, 2001.

Marc L. Bovos, Hamilton, Warren & Bovos, Poteau, OK, for Petitioner/Appellant.

David K. Ratcliff, Ivy, Ratcliff & Chasteen, P.C., Chickasha, OK, for Respondent/Appellee.

BUETTNER, Presiding Judge.

¶1 Respondent/Appellant James Fred Hill (Hill), Personal Representative of the Estate of Hubert M. Perry (Mr. Perry), appeals from the trial court's decision that Ruth L. Jones–Perry (Mrs. Jones–Perry), deceased, survived her husband Mr. Perry, so that the Uniform Simultaneous Death Act[1] (the Act)

---

**1.** 58 O.S.1991 §§ 1001 *et seq.* The Act is currently adopted in 33 states and the District of Columbia.

was not applicable to the determination of heirs in the respective probate cases. Petitioner/Appellee Rich D. Jones (Jones), Personal Representative of the Estate of Ruth L. Jones Perry, responds that the trial court did not err in its order. Because we find insufficient evidence to support the trial court's finding that Mrs. Jones–Perry survived Mr. Perry, we reverse the Order Determining Heirship[2] and remand for proceedings consistent with this opinion.

¶ 2 Mr. Perry and Mrs. Jones–Perry were spouses. No children were born of their marriage, but Mrs. Jones–Perry had three grown children from a prior marriage. Mr. Perry's potential heirs consisted of his surviving half-siblings and nieces and nephews who were the children of Mr. Perry's deceased half-siblings. On August 21, 1999, the couple was riding together in Grady County when they were involved in a head-on auto collision in which they both died at the scene. The issue at trial was whether their deaths were simultaneous, or whether one survived the other. This decision impacted the determination of each decedent's heirs and the heirs' rights to the property in the estates.

¶ 3 In its Order Determining Heirship, filed June 7, 2000, the probate court found that Mrs. Jones–Perry survived Mr. Perry. The trial court then listed the surviving heirs of Mr. Perry, which included Mrs. Jones–Perry, and listed the surviving heirs of Mrs. Jones–Perry, which were her three children. The order did not make any other findings, or order the distribution of any part of the estates.

¶ 4 On appeal, Hill first argues that the trial court erred in finding that Jones was required to prove that Mr. Perry predeceased Mrs. Jones–Perry by a preponderance of the evidence. The Act provides:

Where the title to property or the devolution thereof depends upon priority of death of two or more persons and there is no sufficient evidence to establish that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, except as provided otherwise in this act.

58 O.S.1991 § 1001. Hill acknowledges that there is no Oklahoma case establishing the burden of proof required to remove a case from the bounds of the Act.[3] Hill urges adoption of the clear and convincing evidence standard as the burden of proof, notwithstanding cases from other states which hold that the party seeking to establish survivorship must prove such by a preponderance of the evidence. *Norton v. Bunnell*, 257 Cal. App.2d 324, 65 Cal.Rptr. 139 (1967); *In re Di Bella's Estate*, 199 Misc. 847, 100 N.Y.S.2d 763 (N.Y.Sur.1950), aff'd. 279 App.Div. 689, 107 N.Y.S.2d 929 (1951).

¶ 5 The question of the quantum of proof required to establish survivorship is an issue of first impression in Oklahoma. The states which have addressed this issue concur with *Rowley* and *DiBella* and find that a preponderance of the evidence is equivalent to the "sufficient evidence" of survivorship referred to in the Act. See *Janus v. Tarasewicz*, 135 Ill.App.3d 936, 482 N.E.2d 418, 422, 90 Ill. Dec. 599 (1985); *Fiumefreddo v. Scudder*, 252 Ga. 279, 313 S.E.2d 683 (1984); *In re Moran's Estate*, 77 Ill.2d 147, 395 N.E.2d 579, 581, 32 Ill.Dec. 349 (1979); *In re Schmidt's Estate*, 261 Cal.App.2d 262, 270, 67 Cal.Rptr. 847 (1968); *Rimmer v. Tesla*, 201 So.2d 573, 577 (Fla.App.1967); *United Trust Co. v. Pyke*, 199 Kan. 1, 427 P.2d 67 (1967) (overruled on other grounds by *Harper v. Prudential Ins. Co. of America*, 233 Kan. 358, 662 P.2d 1264 (1983)); *Schmitt v. Pierce*, 344 S.W.2d 120, 123 (Mo.1961); *In re Saligman's Estate*, 13 Pa. D. & C.2d 432, 74 Montg. 287, 72 York 84, 8 Fiduc. Rep. 93 (1958); *In re Moore's Will*, 14 Misc.2d 85, 178 N.Y.S.2d 1000 (1958) (Proof of survivorship may be circumstantial and the ultimate fact does not have to be established beyond a

---

2. The personal representatives of Mr. Perry and Mrs. Jones Perry filed separate probate proceedings, numbered P–99–100 and P–99–89, respectively. The cases were consolidated for purposes of the Order Determining Heirship. One order was issued making that determination and the appeal is from that order.

3. The Act is inapplicable if there is "sufficient evidence" that one party survived the other. *In re Davenport*, 323 P.2d 611, 79 Idaho 548 (1958); *Smith v. Smith*, 317 S.W.2d 275, 229 Ark. 579 (1958); *Sauers v. Stolz*, 218 P.2d 741, 121 Colo. 456 (1950).

reasonable doubt; rather, the evidence is sufficient if an inference can be drawn fairly and reasonably to the exclusion of all others.); *In re Cruson's Estate*, 189 Or. 537, 221 P.2d 892 (1950) (Evidence of survivorship is sufficient when it satisfies "an unprejudiced mind."); *Prudential Ins. Co. v. Spain*, 339 Ill.App. 476, 90 N.E.2d 256 (1950) (rejecting "beyond a reasonable doubt" standard in favor of the "preponderance" standard of proof).

¶ 6 A provision of the Act which provides that the Act "shall be so construed and interpreted as to effectuate its general purpose to make uniform the law in those states which enact it," 58 O.S.1991 § 1007, lends persuasive value to the above-cited cases. Further, the Act as adopted in Oklahoma gives no indication of legislative intent to require a more stringent burden of proof. Finally, the Act itself refers to "sufficient evidence" of survivorship, which suggests proof of survivorship by a preponderance of the evidence is all that the Act requires. For these reasons, we adopt the rule that parties seeking to avoid the implications of the Act must prove that the decedents died "otherwise than simultaneously" by a preponderance of the evidence.[4] We therefore find no error in the trial court's determination that Jones was required to prove by a preponderance of the evidence that Mrs. Jones–Perry survived Mr. Perry.

■ ¶ 7 Nevertheless, we find merit in Hill's next assertion of error, that there was insufficient evidence to support a finding that Mr. Perry and Mrs. Jones–Perry died "otherwise than simultaneously." The evidence at trial consisted of the testimony of witnesses who observed the collision and went to the scene to help the victims. Ryan Patrick Stroud, an eighteen year old resident of Minco, testified that around 10:30 or 11:00 p.m. on the night of August 21, 1999, he was returning to Minco from Tuttle after attending a beauty pageant in Tuttle. While driving alone along Highway 37 that night he saw Brad Duvall waving at him to stop and he saw that a wreck had occurred and he stopped his car. Stroud explained that he first went to the car driven by Chaine Bunn[5] and then walked over to the car occupied by Mr. Perry and Mrs. Jones–Perry. Stroud explained that Mr. Perry was lying on the ground next to the car and Stroud pulled him away from the car. Stroud testified regarding his observations of Mr. Perry and Mrs. Jones–Perry:

A: Well, he was laying on the ground and you could still hear him, like, breathing. But there was stuff in his throat. And we pulled him away from the car because it was on fire.

And then you could—Bo [witness Jerad Kirkes] went up and the lady was still—you could still—you could still hear her breathing, too. And that's when we got the water hose and stuff and sprayed the car down.

Q: Okay. All right. Did you hear what you believe to be Mr. Perry's last breath?

A: No. After he was—like after we moved him away from the car, we went back over to the other car and like tried to open the door and get the lady [Mrs. Jones–Perry] out.

\* \* \*

A: Then when I went back over there, he wasn't breathing any more.

Q: Okay.

A: And she was still gurgling.

---

4. Although Hill argues that courts in Missouri have adopted "substantial evidence" as the burden of proof, our review of *Schmitt v. Pierce*, *supra*, and *Matter of Estate of Viviano*, 624 S.W.2d 130, 132 (Mo.App.1981), both cited by Hill, indicates that *Schmitt* noted that the Act requires "sufficient evidence" and noted that Missouri cases have defined "substantial evidence" and also have established the burden of proof as a preponderance of the evidence. The *Schmitt* opinion did not distinguish "substantial evidence" and "preponderance" as separate burdens of proof, but rather included them in a synthesis of cases interpreting the Act's requirement of "sufficient evidence." *Schmitt* further noted that Missouri's rulings on survivorship were in accord with other states and suggested that survivorship requires no higher degree of proof than any other fact. *Schmitt* at 123. *Viviano* simply cited *Schmitt* for the holding that "sufficient evidence" means "substantial evidence."

5. Other testimony indicated that Bunn caused the accident by attempting to pass another car on a hill.

Q: Okay. Did you believe that he had died at that point?

A: Yes.

Q: All right. You didn't see any more breathing—

A. No sir.

Q: —Movement by him that you had seen earlier?

A: No sir.

Q: Okay. And you went back and you heard or saw that she was still breathing?

A: 'Cause that's when—yes. That's when Bo crawled in the car and tried to bust the glass out.

Q: Okay. When you saw—you stated that you believe she was still breathing, what did you observe?

A: I looked in the car and her head was just limp. And I could still hear her, you know, kind of gurgling a little bit.

But I knew she wasn't going to make it because there was stuff on the steering wheel and stuff.

Q: Both had severe injuries and were unconscious at that time?

A: Right.

Q: Okay. But did you actually see her chest moving or some breath—what appeared to be breath actions by her body?

A: No. But I could hear that gurgling sound like she was still breathing. But there was like blood and stuff in her lungs.

Stroud concluded that in his mind Mrs. Jones–Perry survived Mr. Perry "by at least a minute."

¶ 8 Jerad Mark Eli "Bo" Kirkes, an eighteen year old Minco resident, testified that he was driving his car on Highway 37 going from Tuttle back to Minco on the night of August 21, 1999. Kirkes testified that he had also been at the beauty pageant and had served as an escort for a girl who was with him in the car on his drive back to Minco. Kirkes explained that as he rounded a curve he saw the wreck about a quarter of a mile ahead and he stopped after seeing Brad Duvall waving for traffic to stop. Kirkes testified that one of the cars was on fire under the hood so he walked up to see if anyone was in the car. He explained that he saw that the steering wheel and instrument panel were pushed up against Mrs. Jones Perry's chest and that her head was laying back against the seat. Kirkes testified that Mrs. Jones–Perry was unconscious at the time he found her there. Kirkes explained that he felt Mrs. Jones–Perry's neck for a pulse and felt that she had a pulse and also noticed that she was still breathing. Kirkes testified that he then looked down and saw that Mr. Perry was lying underneath the car. Kirkes explained that he called for someone to help and they dragged Mr. Perry to the side of the road and down into a ditch and rolled him so that he was face up and that Mr. Perry was then gasping for breath. Kirkes testified that he then went back to the car and tried to get Mrs. Jones–Perry out. Kirkes discovered that the driver's door would not open so he kicked in the window of the rear driver's side door and climbed in behind Mrs. Jones–Perry. He tried to pull the front seat-back down but could not move it. Kirkes then climbed into the front seat and tried to kick the passenger door open but he was unsuccessful. Kirkes testified that the car was getting hot due to the fire so he climbed back into the backseat and got out of the car through the back passenger door.

¶ 9 Kirkes further testified that a person who lived near the crash site brought out a water-hose and they put the fire out. He explained that he then checked Mrs. Jones–Perry's pulse again and noticed that she still had a pulse but that she was not breathing at that point. Kirkes then turned around and noticed that "they were still doing CPR on [Mr. Perry]." Kirkes stated though, that "at that time I ... really didn't consider him ... to be alive after before I left him." Kirkes explained that after he looked around then and became aware of what had happened for about 20 seconds, he then checked Mrs. Jones–Perry's pulse again and felt nothing. Kirkes testified that he believed that Mr. Perry drew his last breath while Kirkes was still with him after dragging him into the ditch. Kirkes concluded that Mrs. Jones Perry outlived Mr. Perry by three to six minutes. Kirkes conceded on cross-examination that it was possible that he had been feeling his own pulse when he thought he

detected a pulse in Mrs. Jones–Perry, but he stated he knew that she was still breathing while he checked for a pulse the first time. Kirkes also conceded that he never checked for Mr. Perry's pulse and that it was possible that Mr. Perry could have had a pulse after he found that Mrs. Jones–Perry did not have a pulse.

¶ 10 Robert Bradley Duvall, a twenty-one year old Minco resident, testified that on the night of August 21, 1999, he and his girlfriend were returning to Minco following the beauty pageant. Duvall explained that as he was driving west on Highway 37, he saw Chaine Bunn come from the north and pull out in front of Duvall. Duvall had to brake to avoid hitting Bunn who was driving recklessly. Duvall watched as Bunn pulled out into the eastbound lane, in a no-passing zone, in order to pass the car in front of Bunn. Duvall saw headlights coming from the opposite direction and saw Bunn's car hit the Perrys' car head-on.

¶ 11 Duvall testified that he stopped his car and began to flash his lights at other motorists to tell them to slow down. Duvall stated "(b)y the time that I had stopped traffic, there were people already there. And Mr. Perry was laying on the ground face down and Mrs. [Jones-]Perry was in the car." Duvall further explained that he and Stroud and Kirkes moved Mr. Perry and that "at this time he was not breathing as far as I know." Duvall noted that the Perrys' car engine then caught fire, but that some neighbors brought out their hose and put the fire out. Duvall testified that he did not observe either Mr. Perry or Mrs. Jones–Perry alive. He also stated that he never saw Kirkes feel for Mrs. Jones–Perry's pulse, but that he remembered Kirkes yelling that "she has a pulse, she is alive." Duvall concluded that Mr. Perry was dead at the time he helped to move him away from the car, but Duvall had no opinion as to whether Mr. Perry or Mrs. Jones–Perry died first.

¶ 12 Hill also presented the death certificates for Mr. Perry and Mrs. Jones–Perry, which both stated 11:15 p.m. as the time of death.[6] In his argument to the trial court, Jones indicated that the cases interpreting the Act provide that even a one second difference in time of death precludes application of the Act. Jones asserted that the uncontroverted lay testimony showed that Mrs. Jones–Perry survived Mr. Perry by at least one minute. Hill argued that none of the testimony regarding the witnesses' determination of the deaths of the victims met the requirements of the Uniform Determination of Death Act. 63 O.S.Supp.1996 § 3122. That section is part of the public health laws and defines the conditions establishing that a person is dead.[7] The parties stipulated that the determination of whether Mr. Perry and Mrs. Jones–Perry died otherwise than simultaneously was within the trial court's province.

¶ 13 *Rowley, supra,* noted that "if there is any sufficient evidence that either party survived the other, even when the deaths occur at substantially the same time, the statute is inapplicable and the question of survivorship must be determined as any other fact." 257 Cal.App.2d at 333, 65 Cal.Rptr. 139. That opinion further noted that courts have rejected claims that deaths which occur "substantially or approximately at the same time" are simultaneous under the Act. *Id.* Survivorship may be proven by direct or circumstantial evidence and the issue is one of fact for the trial court's determination. *Id.* at 334, 65 Cal.Rptr. 139. The trial court's decision on survivorship is a finding of fact.

---

**6.** It has been held that death certificates may constitute prima facie evidence of the time of death, but that such evidence may be overcome by competent evidence to the contrary. *Rimmer, supra,* 201 So.2d at 576–577 (identical times of death on couples' death certificates was overcome by attending physician's testimony that the wife survived her husband by approximately fifteen minutes).

**7.** Specifically, 63 O.S.Supp.1996 § 3122 provides:

An individual who has sustained either:
1. irreversible cessation of circulatory and respiratory functions, or
2. irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards; provided however, all reasonable attempts to restore spontaneous respiratory or circulatory functions shall first be made, prior to such declaration.

*Estate of Villwock,* 142 Wis.2d 144, 418 N.W.2d 1, 2; *Thomas v. Anderson,* 96 Cal. App.2d 371, 215 P.2d 478, 481 (1950). To avoid the implications of the Act, it is necessary to prove only that one party survived the other by at least one second. *Schmitt, supra,* 344 S.W.2d at 124; *Di Bella, supra,* 100 N.Y.S.2d at 770.

¶ 14 The testimony established that both Mr. Perry and Mrs. Jones–Perry were alive when the first witnesses came upon the scene. Accordingly, we are unable to conclude that they both died immediately in the collision. Hill's primary argument is that none of the witnesses testified to either of the Perrys' deaths using the definition of "death" found in the Uniform Determination of Death Act ("UDDA"). 63 O.S.Supp.1996 § 3122 (see Note 7, *supra* ). Hill urges that a lay person may make a determination of death under this statute, but suggests that such a statement is not valid without testimony as to both respiratory and circulatory functions. The UDDA defines death as either a) the cessation of respiratory and circulatory functions, or b) cessation of all brain functions. This opinion does not address the issue of brain death.

¶ 15 Because the evidence in the instant case included testimony regarding the cessation of both breathing (respiratory function) and pulse (circulatory function) as to Mrs. Jones Perry, but only testimony as to the cessation of Mr. Perry's breathing, we must determine whether there was sufficient evidence in the record to support a finding that Mr. Perry in fact pre-deceased Mrs. Jones–Perry. For convenience, we refer to the first definition of death in the UDDA as "cardiopulmonary death."

¶ 16 *In re T.A.C.P.,* 609 So.2d 588 (Fla. 1992), provides an extensive history of courts'

attempts to define "death." [8]  *T.A.C.P.* addressed the issue of whether an infant born with anencephaly (an absence of part of the brain) is considered dead for purposes of organ donation laws. The court noted that some states had adopted as part of their common law the cardiopulmonary definition of death, and explained that this definition apparently came from early editions of *Black's Law Dictionary. Id.* at 591. The court's object in giving the history lesson was to explain that the cardiopulmonary definition of death had become inadequate as a result of medical technology which now permits life-support machines to maintain cardiopulmonary function after a patient is "brain dead." *Id.* The Florida court explained that such medical technology led to the adoption of the UDDA in many states. *Id.* at 592.

¶ 17 Florida has not adopted the UDDA, but has drafted a similar statutory provision which provided for a determination of brain death where respiratory and circulatory functions are mechanically maintained. The court concluded that anencephalic infants, who are doomed to suffer brain death but often live briefly after birth without the aid of life support, are not considered "brain dead" while they are not being maintained on life support and while their cardiopulmonary systems continue to function. *Id.* For purposes of the instant case, the court concluded, however, that Florida's common law accepts the cardiopulmonary definition of death, and expressly held that "a person is dead who has sustained irreversible cessation of circulatory and respiratory functions." *Id.* at 593. The court noted that its holding brought Florida law "into harmony with the (UDDA), ..." *Id.* at 594. What is informative in *T.A.C.P.,* for our purposes, is that historically death has required cessation of *both* breathing and heartbeat,[9] while there

---

**8.** See also *Lovato v. District Court,* 198 Colo. 419, 601 P.2d 1072 (1979), which provides a similar historical review of the common law definition of death. The court in *Lovato* noted that before the advent of medical technology which could maintain cardiopulmonary function in a brain dead person, the medical profession concluded that "when a person's heart stopped beating and he stopped breathing, he was dead." *Id.* at 1076. The opinion also noted a report by the Colorado Association of Clinical Neurologists which stated "(w)e believe brain death is a valid diagnosis,

being synonymous with death as *diagnosed traditionally by cessation of cardiorespiratory function." Id.* at 1078 (emphasis supplied).

**9.** See also *Thomas v. Anderson, supra,* 215 P.2d at 481–482 ("death is the cessation of life; the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood, and a cessation of the animal and vital functions consequent thereon, such as respiration, pulsation, etc. ... death occurs precisely when life ceases and

was no evidence in the instant case regarding the cessation of Mr. Perry's heartbeat.

¶ 18 In *Estate of Villwock, supra,* the issue was whether spouses died "otherwise than simultaneously" for purposes of application of the Act. As in the instant case, the spouses in *Villwock* were killed in a head-on auto collision. The emergency medical technicians testified that the husband suffered cardiopulmonary failure five minutes before the wife while both were in an ambulance en route to the hospital. Once at the hospital, advanced CPR was given to both spouses and about an hour later a doctor pronounced the wife dead and then the husband ten minutes later. The doctor testified that the husband's cardiopulmonary failure in the ambulance was irreversible and that the husband therefore pre-deceased the wife, despite the times they were declared dead. The trial court concluded that the wife survived the husband and the husband's potential heirs appealed.

¶ 19 The Wisconsin Court of Appeals noted that Wisconsin had adopted the UDDA but, like the instant case, it was only concerned with the first alternative under UDDA: "death is the irreversible failure of the cardiorespiratory system." *Id.* at 2. The court upheld the trial court's findings. This decision supports our view that UDDA is applicable for determining death for purposes of the Simultaneous Death Act. And, the *Villwock* decision reiterates that "death" under the first part of UDDA requires cessation of both breathing and heartbeat.

¶ 20 In explaining that the determination of death must be made in accordance with accepted medical standards, the *Villwock* opinion quoted the following language from the prefatory note to the UDDA: "(t)his Act is silent on acceptable diagnostic tests and medical procedures. It sets the general legal standard for determining death, but not the medical criteria for doing so." *Id.* at 3. This language indicates that, although there was expert medical witness testimony in *Villwock,* such expert testimony is not required. Indeed, other cases have held that lay testimony may provide sufficient evidence of survivorship for purposes of the Act.

¶ 21 *Janus, supra,* also involved a case in which survivorship between spouses was at issue. 90 Ill.Dec. 599, 482 N.E.2d at 419. In *Janus,* the spouses unwittingly consumed Tylenol capsules laced with cyanide. *Id.* They were placed on life support but both eventually died. *Id.* The court noted that Illinois had adopted the two alternatives for establishing death (brain death or cardiopulmonary death). The court reiterated that the common law standard is the irreversible cessation of circulatory and respiratory functions. *Id.* at 421.

■ ¶ 22 The court in *Janus* explained that "where the question of survivorship is determined by lay witnesses, the burden of sufficient evidence may be met by evidence of a positive sign of life in one body and the absence of such sign in the other." *Id.* at 422, citing *In re Estate of Lowrance,* 66 Ill.App.3d 159, 162, 22 Ill.Dec. 895, 383 N.E.2d 703 (1978); *Prudential Ins. Co. v. Spain, supra.* Although "sign of life" is not expressly defined in *Janus,* the opinion later refers to cardiopulmonary functions as a sign of life. We therefore conclude that lay witnesses may testify as to the fact of cardiopulmonary death. See *Schmitt v. Pierce, supra,* and *Sauers v. Stolz, supra,* (both relying on lay witness testimony to support a finding on survivorship based on cardiopulmonary death); *McCurtis v. Life Ins. Co. of North America,* 849 F.Supp. 1141, 1146 (S.D.Miss. 1994) (only evidence of survivorship was lay testimony, held that medical evidence is not essential to prove survivorship under the Act).

¶ 23 These cases establish that lay testimony may be sufficient to support a finding on the issue of survivorship. However, in all of these cases lay testimony as to death addressed both aspects of cardiopulmonary death cessation of breathing and pulse. We compare, for example, *Sauers v. Stolz, supra,* in which the lay witness testified regarding a husband and wife who died in a vehicle accident. The witness testified that he checked the wife for a pulse and found none and noted that she had dust in her nostrils and had not taken a breath since the time of the accident. The witness testified that after he

does not occur until the heart stops beating and respiration ends.").

noted these two circumstances with the wife, he then checked the husband and detected a weak pulse. *Id.* at 459–460, 218 P.2d 741. In that case, the appellate court determined that the parties did not die simultaneously and that the husband survived the wife and reversed the trial court's finding that the couple died simultaneously.

¶ 24 In the instant case, the witnesses gave conflicting testimony regarding when they believed Mr. Perry died and regarding whether Mrs. Jones–Perry survived her husband. None of the witnesses testified to ever checking the pulse of Mr. Perry. Rather, witnesses Stroud and Kirkes testified that they believed Mr. Perry took his last breath while Mrs. Jones–Perry continued to make gurgling sounds. Kirkes checked Mrs. Jones Perry for a pulse and noted that she continued to have a pulse after she stopped breathing. Kirkes was aware that CPR was still being performed on Mr. Perry at that time, but that Kirkes had decided Mr. Perry was dead. Kirkes stated that he never checked for a pulse on Mr. Perry. Witness Duvall had no opinion on which of the Perrys may have died first.

¶ 25 It is undisputed that Mr. Perry and Mrs. Jones–Perry both died at the scene of the wreck. However, based on the lack of evidence regarding whether Mr. Perry had a pulse, either before or after Mrs. Jones–Perry's pulse and breathing ended, we find there was insufficient evidence that the parties died "otherwise than simultaneously." It is equally possible, based on the evidence before the trial court, that Mr. Perry could have had a pulse after he stopped breathing and died at the same moment as Mrs. Jones–Perry, or even after she did. There is simply insufficient evidence of the time of Mr. Perry's death to support the finding that Mrs. Jones–Perry survived her husband.

¶ 26 Hill's final argument on appeal is that the order must be reversed because the trial court relied exclusively on the testimony of the lay witnesses. We have noted above that lay testimony may provide the sufficient evidence required by the Act. Hill points to the following statement included in the Order Determining Heirship:

> In the absence of a doctor or medical examiner, ordinary lay witnesses can testify that Mrs. Perry had a pulse and was breathing after Mr. Perry had no breath and pulse. Absent any other proof, the Court has to rely on facts by such lay witnesses.

¶ 27 Hill emphasizes the phrase "court has to rely" and urges that the trial court has thereby indicated that it believed it was bound to accept the lay witnesses' testimony, which Hill argues the court was not bound by. The case on which Hill relies, *Matter of Estate of Campbell,* 56 Or.App. 222, *641 P.2d 610* (1982), does not contain the rule cited by Hill that "the trial court was free to ignore or not adopt as its conclusions the testimony of lay witnesses if the court did not determine that such evidence met applicable legal requirements." More importantly, however, we are unpersuaded that the court's statement in its order, that the lay testimony was the only evidence presented, indicates that the trial court gave the lay testimony undue import.

¶ 28 That issue is merely academic, however, because we reverse. Based on our determination that there was insufficient evidence in the record to support a finding that the Perrys died "otherwise than simultaneously," and therefore such a finding is against the clear weight of the evidence, we reverse the trial court's order that Mrs. Jones–Perry survived Mr. Perry. We therefore remand with instructions to enter a new Order Determining Heirship reflecting this holding.

¶ 29 REVERSED AND REMANDED for proceedings consistent with this opinion.

¶ 30 GARRETT, J., concurs; HANSEN, C.J., concurs in result.