PILZ v. BOND2022 OK CIV APP 4Case Number: 118383Decided: 05/03/2021Mandate Issued: 03/09/2022DIVISION IITHE COURT OF CIVIL APPEALS OF THE STATE OF OKLAHOMA, DIVISION II
Cite as: 2022 OK CIV APP 4, __ P.3d __

APPROVED FOR PUBLICATION BY THE SUPREME COURT.

 

 

IN THE MATTER OF THE ESTATE OF LESLIE B. CATES, Deceased, and IN THE MATTER OF THE ESTATE OF GERALD RICHEY CATES, Deceased:

MARK B. PILZ, Appellant,
v.
AUSTIN BOND and LINDSEY BOND, Appellees.

APPEAL FROM THE DISTRICT COURT OF
TULSA COUNTY, OKLAHOMA

HONORABLE JEFFERSON D. SELLERS, TRIAL JUDGE

AFFIRMED

D.E. Dismukes, DISMUKES LAW OFFICE, Tulsa, Oklahoma, for Appellant

Randall A. Gill, Randi N. Gill, GILL LAW FIRM, Tulsa, Oklahoma, for Appellees

DEBORAH B. BARNES, JUDGE:

¶1 Pursuant to a provision in the Last Will and Testament of Leslie B. Cates, deceased, Appellant Mark B. Pilz would be a beneficiary of Mrs. Cates' estate if Mrs. Cates and Gerald Richey Cates died simultaneously. A nonjury trial was held on this issue after Mr. and Mrs. Cates died on the same date as a result of a murder-suicide. In its Decree filed in July 2019, the trial court determined Mrs. Cates "died first as a result of a homicide/suicide committed by [Mr. Cates] and that [Mr. Cates] died second." Thus, the trial court found "by a preponderance of the evidence that there is sufficient evidence to support the finding that Mr. Cates and Mrs. Cates died otherwise than simultaneously," and therefore concluded Mr. Pilz is not a beneficiary of Mrs. Cates' estate. Mr. Pilz subsequently filed a motion for new trial which was denied by the trial court in its Order filed in October 2019. Based on our review, we affirm.

BACKGROUND

¶2 Mrs. Cates executed her Will naming Mr. Pilz as a beneficiary only in the event Mrs. Cates and Mr. Cates should die simultaneously. The Will provides, in pertinent part, that "[i]f my Husband and I should die simultaneously as defined herein or my Husband predeceases me, then I give, devise, and bequeath all my property, except as otherwise bequeathed in this Will, to [Mr. Pilz]." The Will defines a simultaneous death as occurring "if there is no sufficient evidence to establish that we died other than simultaneously."

¶3 Mr. Cates shot and killed Mrs. Cates during the early morning hours of January 25, 2018. Mrs. Cates sustained multiple gunshot wounds, including one to the head. Mr. Cates subsequently committed suicide by shooting himself in the head. Prior to doing so, Mr. Cates telephoned Mr. Pilz, a longtime friend of Mrs. Cates, and informed him that he had shot and killed Mrs. Cates, that he "may do the same" to himself, and that Mr. Pilz should call 911.

¶4 The phone call to Mr. Pilz was made at 6:24 a.m., and the police arrived at Mr. and Mrs. Cates' residence at approximately 6:35 a.m. However, no entry was made into the residence until a special-operations team forcefully entered at 9:29 a.m., at which time Mr. and Mrs. Cates were found dead in their bedroom. No shots were fired after the police arrived, and it is undisputed Mr. Cates shot himself sometime after his phone call to Mr. Pilz and before the time the police arrived.

¶5 Austin Bond and Lindsey Bond are Mrs. Cates' children from a previous marriage. This probate proceeding was initiated when Mr. Bond filed a petition seeking appointment as interim and special administrator. Mr. Bond further asserted he and Ms. Bond are the only heirs of Mrs. Cates.

¶6 As set forth in the pre-trial conference order filed in April 2019, the court "limited the scope of the first phase of this matter to a bench trial on the question o[f] whether there was a simultaneous death" for purposes of determining whether Mr. Pilz is a beneficiary. The nonjury trial on this question was held on June 27, 2019, and several witnesses testified, including a forensic pathologist who testified that although the murder-suicide was not a "witnessed death," and although he did not have "an opinion regarding the exact time of either one's death," "it would be very unlikely, highly unlikely that [Mr. Cates] would have died first, . . . and I would say [there is a] 90 percent plus likelihood that [Mrs. Cates] died first."

¶7 Following the trial, the court set forth in its Decree, as stated above, that by a preponderance of the evidence Mr. and Mrs. Cates did not die simultaneously, and that Mr. Pilz was therefore not a beneficiary of Mrs. Cates' estate.

¶8 Mr. Pilz subsequently filed a motion for new trial in which he asserted it was Mrs. Cates' "intent, as expressed in the residuary article of the Will, that her estate go to [Mr. Pilz] if there is no sufficient evidence that she and Mr. Cates died other than simultaneously." He further asserted the definition of simultaneous death in the Will is consistent with the definition of simultaneous death as set forth in the Uniform Simultaneous Death Act, 58 O.S. 2011 §§ 1001-1008, and, thus, cases interpreting the Act are applicable to the present case. Mr. Pilz asserted, in effect, that at least pursuant to some cases applying the Act, the deaths of Mrs. Cates and Mr. Cates could not be found to have occurred other than simultaneously because no one directly witnessed and reported the earlier cessation of Mrs. Cates' "[heartbeat and] breathing, or all functions of her entire brain, including the brain stem[.]" That is, Mr. Pilz asserted:

In order for Mr. Cates to survive Mrs. Cates, there must be evidence that her heart had ceased beating and she ceased breathing, or all functions of her entire brain, including the brain stem had ceased along with evidence that [at that same moment] Mr. Cates' heart was still beating and he was still breathing or his entire brain, including the brain stem, was still functioning.

¶9 Mr. Pilz further asserted that although the medical examiner assigned to the case opined it is more probable than not that Mrs. Cates died before Mr. Cates, according to Mr. Pilz "anything is probable." Mr. Pilz asserted that the medical examiner's "interrogatory answers make it clear that there is no sufficient evidence of when the Cates 'exactly' died, therefore they died simultaneously based on the [time they were found]."

¶10 Mr. Pilz' motion for new trial was denied by the trial court in its Order filed in October 2019. The trial court stated in its Order as follows:

At least the following evidence established to the satisfaction of this court by a preponderance that Mr. and Mrs. Cates 'died other than simultaneously' . . . :
1. Mr. Cates declared he shot and killed his wife in a phone call to [Mr.] Pilz. This fact alone distinguishes this case from any cited by defendant. Mr. Cates reported not just the shooting, but the fact of the death of his wife, at a time when he obviously was very much alive.
2. While he did not determine the times of death of Mr. and Mrs. Cates, Dr. Miller, the M.D. pathologist who oversaw a complete autopsy of Mrs. Cates and an external exam only of Mr. Cates, testified by interrogatory: "It is more probable than not that [Mrs. Cates] would have died before [Mr. Cates]."
3. Dr. Sibley, the plaintiff's retained expert and past medical examiner at the Tulsa Office of the Chief Medical Examiner clearly testified and supported his opinion that the probability of Mrs. Cates dying before Mrs. Cates was 90 percent. His opinion was supported by physical facts which were not controverted.

Mr. Pilz appeals.

STANDARD OF REVIEW

¶11 The Oklahoma Supreme Court has explained that

[p]robate proceedings are of equitable cognizance. While an appellate court will examine and weigh the record proof, it must abide by the law's presumption that the nisi prius decision is legally correct and cannot be disturbed unless found to be clearly contrary to the weight of the evidence

In re Estate of Holcomb, 2002 OK 9063 P.3d 9Id. (footnote omitted).

ANALYSIS

I. Simultaneous Death

¶12 Section 1001 of the Uniform Simultaneous Death Act (the Act), 58 O.S. 2011 §§ 1001-1008, provides as follows:

Where the title to property or the devolution thereof depends upon priority of death of two or more persons and there is no sufficient evidence to establish that the persons have died otherwise than simultaneously, the property of each person shall be disposed of as if he had survived, except as provided otherwise in this act.

"[A] preponderance of the evidence is equivalent to the 'sufficient evidence' of survivorship referred to in the Act." In re Estates of Perry, 2001 OK CIV APP 13640 P.3d 492cert. denied (citations omitted). Thus, "parties seeking to avoid the implications of the Act must prove that the decedents died 'otherwise than simultaneously' by a preponderance of the evidence." Id. ¶ 6 (footnote omitted). The Perry Court adopted the rules from other jurisdictions that

if there is any sufficient evidence that either party survived the other, even when the deaths occur at substantially the same time, the [Act] is inapplicable and the question of survivorship must be determined as any other fact. . . . [C]ourts have rejected claims that deaths which occur substantially or approximately at the same time are simultaneous under the Act. Survivorship may be proven by direct or circumstantial evidence and the issue is one of fact for the trial court's determination. The trial court's decision on survivorship is a finding of fact. To avoid the implications of the Act, it is necessary to prove only that one party survived the other by at least one second.

Id. ¶ 13 (emphasis added) (internal quotation marks omitted) (citations omitted).

¶13 "[E]xpert medical witness testimony . . . is not required," and, "[i]ndeed, other cases have held that lay testimony may provide sufficient evidence of survivorship for purposes of the Act." Id. ¶ 20. Nevertheless, in the present case, Appellees did present expert testimony. Michael Andrew Sibley, M.D., a forensic pathologist, testified that he completed a five-year anatomic and clinical pathology residency after receiving his medical degree, and that he has been a forensic pathologist for twenty-five years, including "for 12 years as a full-time forensic pathologist for the Office of the Chief Medical Examiner here in Tulsa," and for the past seven years "doing private autopsy work and forensic consultation." Dr. Sibley agreed at trial his opinion that it is "highly likely" that Mrs. Cates died first is "within a reasonable degree of medical certainty," and he agreed his testimony was based upon his training, experience, and review of the records, including the autopsy performed on Mrs. Cates. Dr. Sibley explained that not only was Mrs. Cates shot in the head, but she was also shot, inter alia, in the neck with a bullet "that passed through her cervical spine, . . . into her mouth, through her tongue, through her jaw bone, and exited out of her left cheek." As set forth above above, Dr. Sibley testified that although "percentages are difficult," there is a "90 percent plus likelihood that [Mrs. Cates] died first."

¶14 Regarding the bullet that passed through Mrs. Cates' head, Dr. Sibley testified she "had a wound just above her right ear that passed across her head and exited above her left ear." He testified that Mrs. Cates "was autopsied completely," and based on this autopsy the bullet that passed through her head "actually passed through her brainstem, a portion of the brainstem called the midbrain, which is at the base of the brain." He stated that "almost instantaneous death" resulting from shots to the head usually only occur when a bullet goes through the "medulla oblongata, which is a part of the brainstem just below the midbrain." Because the bullet passed only "about an inch above [Mrs. Cates' medulla oblongata]," "based on how ballistics are known to occur" there is "a good likelihood that there may have been some functional damage in the region of the medulla" from an "expansion of the tissues as the bullet passe[d] with high velocity" just above that area of the brain.

¶15 On the other hand, Dr. Sibley testified that Mr. Cates' bullet wounds showed that the bullet that caused his death passed "about an inch higher than hers," "[s]o if her bullet passed about an inch above the medulla, the most critical part of the brain, his . . . passed two inches" above this region of the brain and was therefore "[l]ess likely to have" affected his medulla oblongata.

¶16 Dr. Sibley also testified that the multiple gunshot wounds suffered by Mrs. Cates -- to "the shoulder, the neck, the cervical spine" -- "accelerate[d] her death more" in comparison with the single gunshot suffered by Mr. Cates, and, in addition, "[t]he bullet (sic) in her fragmented," while "[t]he bullet in Mr. Cates did not fragment. When we have fragmented bullets, fragmentation causes further injury than if it does not fragment." Dr. Sibley also testified that the bullet that passed through her cervical spine "clearly is a potentially fatal injury just by itself[.]"

¶17 Dr. Sibley testified that it was also relevant to his analysis regarding the sequence of death that Mrs. Cates "was an older woman with heart disease. She had a pacemaker," while Mr. Cates, although he "had some health issues," did not have "heart issues." He testified, "I think preexisting health plays a role in one's survival time."

¶18 Dr. Sibley further testified that although it was not a "critical finding," it was relevant that when Mr. Cates "was found, he did not have any . . . rigor mortis," but "[w]hen [Mrs. Cates] was found . . . , she did have some rigor mortis." He testified that sometimes a gunshot wound can cause one to suffer a seizure, which can then speed up the process of rigor mortis, but that there was no evidence that Mrs. Cates suffered a seizure.

¶19 Dr. Sibley also stated it was "a significant thing to consider" what "is probably the most obvious" fact in this case -- i.e., "that we know that [Mrs. Cates] was shot first based on the circumstances as they were reported." Indeed, Dr. Sibley testified that "there had been some time that had passed before Mr. Cates shot himself" based not only on the undisputed fact of the telephone call Mr. Cates made to Mr. Pilz, in which, as described in more detail below, Mr. Cates stated he had shot Mrs. Cates in the head and that she was dead, but also based on certain "clotted blood in the . . . bathroom sink" which indicated Mr. Cates also had time to wash his hands or "clean up." As stated by Dr. Sibley, Mr. Cates "apparently had time to clean up or get blood off of his hands, or wherever that clotted blood had been." When questioned on cross-examination whether Dr. Sibley could be sure that the blood in the sink was from Mrs. Cates, Dr. Sibley testified: "Well, this was a clot of blood that was fairly large. It wouldn't have been an incidental wound. It's not like a little spot of blood from when you're shaving. This was an actual clot of blood, looked like grape jelly sitting in the bottom of the sink."

¶20 Dr. Sibley's testimony stands at least partially in conflict with the testimony of George Terry Felts, the witness retained by Mr. Pilz who described himself at trial as "a medical-legal death investigator." Mr. Felts stated he had "worked in the funeral industry, the hospital industry, and I was a police officer, I went to -- in undergraduate school, practicum at the State Medical Examiner's Office in Oklahoma City, and then did another semester as a graduate student at that . . . office." Mr. Felts stated he has "assisted with autopsies" and performed "death scene investigations." He stated he was formerly licensed with "the National Association of Death Investigators, I believe it's out of Missouri." He testified that in 1999 he "started a company called Private Autopsy Service in Oklahoma City," and "I'm still there." Mr. Felts stated, "We just offer families an opportunity to see what happened to somebody that's part of their DNA, so they can see how to have a better life for themselves."

¶21 When Mr. Felts was questioned on direct examination whether "the fact that these were not witnessed deaths indicate to you that there may not have been sufficient evidence regarding the time of death," he responded, "Yeah, no, there wasn't. I mean, nobody -- nobody witnessed it, nobody knew, nobody saw it." Nevertheless, although Mr. Felts testified it was not possible to determine exactly when the deaths occurred, he testified, "you can just get close" and you can determine "approximately when it happened[.]" However, counsel for Mr. Pilz then questioned him how "you go about estimating time of death if there is no scientific way to do it," to which Mr. Felts responded that "it has to be based on any (sic) witnesses. If there's no witnesses, then you use . . . the rigor, livor and algor mortis." Mr. Felts also testified that he did not think "the blood in the sink in the bathroom . . . had anything to do with the death[.]"

¶22 Nevertheless, as stated above, while this Court will examine and weigh the record proof, deference must be accorded to the trial court's resolution of conflicting testimony. In the present case, the trial court clearly found the testimony of Mr. Felts -- including his apparent testimony that, because both deaths were not witnessed by a third party, the only evidence in this case that could be relied upon to determine whether the deaths were not simultaneous is rigor mortis -- to be of little weight.

¶23 Returning to the above-described telephone call, Mr. Pilz testified at trial that during that call Mr. Cates stated to him, "I just shot [Mrs. Cates]. I shot her in the head. She's dead." Mr. Pilz testified that Mr. Cates further stated: "She stole $7,000 of my money and bought [her daughter] a car. When I objected, she laughed at me. I put an end to that. I may do the same. Call 911." Moreover, as Mr. Pilz acknowledges in his appellate brief, a neighbor of Mr. and Mrs. Cates told the police that she heard a loud bang only a few minutes before the officers arrived. No further shots were heard. Thus, according to the undisputed timeline of events, Mr. Cates, who fired the shot into Mrs. Cates' head at some point in time prior to the 6:24 a.m. phone call, shot himself only a few minutes prior to 6:35 a.m. Although some evidence was introduced that it was within the realm of the "possible" that Mrs. Cates could have survived for "more than three to four minutes" after she was shot in the head, no evidence was presented that Mrs. Cates could have survived her injuries until a few minutes before 6:35 a.m., even assuming the shot to her head occurred immediately before the 6:24 a.m. phone call. Moreover, even assuming arguendo that such a possibility is supported by some evidence, the trial court's contrary determination that Mr. and Mrs. Cates died otherwise than simultaneously is supported by the preponderance of the evidence presented at trial.

¶24 Thus, based on our review of the record, we conclude the trial court's determination that sufficient evidence was presented that Mr. and Mrs. Cates did not die simultaneously -- i.e., that they died otherwise than simultaneously by a preponderance of the evidence -- is not clearly contrary to the weight of the evidence.

II. Appeal-related Attorney Fees and Costs

¶25 Appellees request, by separation motion, appeal-related attorney fees and costs on the basis that Mr. Pilz' appeal is frivolous.

Stated in its basic form a frivolous appeal is one having no reasonable or legitimate legal or factual basis to support it. It is an appeal where the result is obvious or appellant's arguments are wholly without merit. However, an appeal is not frivolous merely because the lower court's decision is sustained, and all doubts as to whether an appeal is frivolous should be resolved in favor of the appellant. Only if there are no debatable issues upon which reasonable minds might differ and the appeal is so totally devoid of merit that there is no reasonable possibility of reversal will an appeal be deemed frivolous.

Shaw Grp., Inc. v. Greer, 2012 OK CIV APP 24273 P.3d 895

¶26 Appellees also cite to In re Estate of Bartlett, 1984 OK 9680 P.2d 369Id. ¶ 29. However, it appears the Court was referring solely to attorney fees "paid out of an estate" to the personal representative, or "reimbursement from the estate" to the personal representative. Id. For example, as stated in a subsequent case citing In re Estate of Bartlett, "there is little doubt that the trial court may direct payment of reasonable attorney's fees from a decedent's estate to attorneys employed by the personal representative for services rendered the estate below and on appeal." Lewis v. Morris, 2000 OK CIV APP 11814 P.3d 581In re Estate of Bartlett does not support this request, we must deny the motion.

CONCLUSION

¶27 Although we deny Appellees' request for appeal-related attorney fees and costs, we conclude the trial court's determination that by a preponderance of the evidence Mr. and Mrs. Cates did not die simultaneously is not clearly contrary to the weight of the evidence. Therefore, we affirm.

¶28 AFFIRMED.

WISEMAN, P.J., and RAPP, J., concur.

FOOTNOTES

58 O.S. 2011] § 721In re Estate of Summers, 2010 OK CIV APP 4230 P.3d 920

Id. ¶ 8 n.3.

Grisham v. City of Okla. City, 2017 OK 69404 P.3d 843

Perry Court explained that it was addressing an issue of first impression in Oklahoma and, thus, cited cases from other jurisdictions that had also adopted a version of the Act. Id. ¶ 5. The Act states: "This act shall be so construed and interpreted as to effectuate its general purpose to make uniform the law in those states which enact it." 58 O.S. § 1007

United Tr. Co. v. Pyke, 427 P.2d 67, 73 (Kan. 1967), superseded by statute as recognized in Harper v. Prudential Ins. Co. of Am., 662 P.2d 1264 (Kan. 1983) (The Kansas Legislature amended its Act such that when any person shall kill or cause the killing of his or her spouse, and shall then take his or her own life, the estates and property of both persons shall be disposed of as if their deaths were simultaneous). We note that the Uniform Determination of Death Act (the UDDA), 63 O.S. 2011 §§ 3121-3123, states that a person "is dead" who "has sustained either: 1. irreversible cessation of circulatory and respiratory functions, or 2. irreversible cessation of all functions of the entire brain, including the brain stem[.]" 63 O.S. § 3122Perry, "[§ 3122] is part of the public health laws and defines the conditions establishing that a person is dead," In re Estates of Perry, 2001 OK CIV APP 136Perry Court also stated that "[s]urvivorship may be proven by direct or circumstantial evidence and the issue is one of fact for the trial court's determination," id. ¶ 13. As stated above, sufficient evidence must be presented that the deaths in question were other than simultaneous; if properly proved by a preponderance of the evidence, uncertainty as to the exact minute or second of death does not render the Act (i.e., the Uniform Simultaneous Death Act) applicable. Rather, the Act "is inapplicable if there is evidence as to which one of the parties survived the other or if there are particular circumstances from which the fact of survivorship may be inferred. . . . [T]he fact of survivorship requires no higher degree of proof than any other fact in the case[.]" In re Schmidt's Estate, 261 Cal. ApP.2d 262, 270 (1968) (citation omitted). "The burden is on the party whose claim is dependent upon survivorship to prove the order of death by a preponderance of the evidence, the same degree of proof as is required in other civil cases," and "[d]irect or circumstantial evidence may properly be used to prove survivorship." In re Moran's Estate, 395 N.E.2d 579, 581 (Ill. 1979). See also Pyke, 427 P.2d at 73 ("The period of survival is immaterial."). Finally, while a court's "process of reasoning is defective if the circumstances from which it is sought to deduce the conclusion depend also upon conjecture and speculation," Midland Valley R. Co. v. Rupe, 1922 OK 335210 P. 1038id., such as, for example, the location and number of the bullet wounds, the existence of clotted blood in the bathroom sink, and the telephone call.

20 O.S. 2011 § 15.112 O.S. 2011 § 995Brown v. Thompson, 2018 OK CIV APP 19